

This opinion was filed for record

at 8:00 am on Sept 8, 2016

SUSAN L. CARLSON
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In the Matter of the Parental Rights to

K.M.M.

No. 91757-4

En Banc

Filed    SEP 0 8 2016

YU, J.—This case requires us to determine whether parental rights may be terminated where a father is unable to parent his child due to a lack of attachment and continuing the parent-child relationship will be detrimental to the child's emotional development and mental well-being.

The child has been in foster care since she was six and a half years old. She was removed from her biological parents' custody in 2009 because their serious substance abuse problems resulted in a neglectful home environment. She was 11 years old at the time of trial in 2013 and will be 14 years old this coming August. She has been in two foster care placements and was physically abused in one of those placements.

It is undisputed that the father completed court-ordered services and remedied the deficiencies identified by the dependency court in prior proceedings.

Nevertheless, the trial court terminated his parental rights based on its conclusion that he remains "unable to parent" due to the child's lack of attachment to him. Clerk's Papers (CP) at 112.

There is substantial evidence to support the trial court's conclusion that all necessary services have been provided to the father and that the provision of any additional services would be futile. Furthermore, the record supports the trial court's finding of current parental unfitness based on the father's inability to parent the child. Consequently, we affirm the Court of Appeals decision to uphold the termination order.

FACTUAL & PROCEDURAL HISTORY

A. DEPENDENCY

The child, K.M.M., was born on August 8, 2002. She will be 14 years old as of August 2016 and has been in foster care for six and a half years—almost half of her life. Since May 2012, K.M.M. has refused to have contact with her father, J.M. (the appellant in this case), and her mother, D.C. (who is not a party on appeal). K.M.M. has expressed her desire to be adopted by her foster parents, whom she refers to as "mommy" and "daddy." 2 Verbatim Report of Proceedings (VRP) at 282, 303.

K.M.M. and her younger sister K.M. were removed from their parents' custody in February 2009, following an emergency room visit where it was

suspected that K.M. had been physically abused by J.M. CP at 106, 123. The hospital staff also had concerns that the parents were misusing prescription opiates. *Id.* at 58. The parents' substance abuse problems created a neglectful home environment. *Id.* at 106. K.M.M. testified that she had to "take care of [her] sister and pretty much change her diaper." 2 VRP at 283. Although ultimately no allegations of abuse were confirmed, D.C. and J.M. agreed to dependency for their daughters on the grounds that neither of them was able to care for the children due to their substance abuse problems. CP at 58; RCW 13.34.030(6)(c).

K.M.M.'s early dependency was marked by instability. The original permanency plan was for K.M.M. and her sister to return to their parents' custody just a few months later. 4 VRP at 653. However, both parents relapsed and went into inpatient treatment, so the children had to remain in foster care. *Id.*

K.M.M.'s first foster placement was an abusive one. It was discovered later that the foster mother spanked K.M.M. with a wooden spoon to punish her for things like running late for school. 2 VRP at 201-02, 290. K.M.M. and her sister were removed from the foster home in July 2009 after the foster mother was hospitalized for a "mental breakdown." CP at 59. They were then placed with K.M.M.'s current foster parents.

When K.M.M. was first placed with her foster parents, she was "emotionally disconnected," and "very quiet, non-engaging." 2 VRP at 182. She would hide

underneath furniture when she had minor accidents, like spilling milk. *Id.* at 184, 202, 290. The foster parents arranged for individual therapy, and K.M.M. began seeing Cory Staton in September 2009. K.M.M. presented "significant social, emotional and developmental delays" when she entered dependency. CP at 107. K.M.M. had not learned to form secure attachments to adults, meaning that she did not know how to rely on adult caregivers. 1 VRP at 64. These attachment problems were exacerbated by the inappropriate corporal punishment that K.M.M. experienced in her first foster home. CP at 107. K.M.M. was also "parentified," meaning she tried to take care of her younger siblings rather than relying on adults. 1 VRP at 64.

Once in a more stable environment and with regular therapy, K.M.M. was able to catch up developmentally. *Id.* at 113. However, her relationship and experiences with her biological parents continued to remain unpredictable. In 2010, an attempt to return K.M.M. to D.C.'s custody failed when D.C. had another relapse. 4 VRP at 651. Additionally, K.M.M.'s younger half-sister K.C., who was born while D.C. was undergoing treatment for her substance abuse, was eventually removed from the mother's custody and brought into foster care with K.M.M. and

K.M.[1] *Id.* The guardian ad litem (GAL) testified that this indicated to K.M.M. that things were not going well with her mother. *Id.*

In early 2011, K.M.M. expressed to her therapist, Ms. Staton, that she wanted to be adopted. 1 VRP at 78. Ms. Staton took no action in response to this statement and did not disclose the information to the Department of Social and Health Services (Department) because she determined that K.M.M.'s desire to be adopted was evidence of her emotional healing and developing ability to form attachments to adults. *Id.* at 79; CP at 126.

In late 2011, K.M.M. began "acting out" during visits with her father by "picking on him" and being confrontational. 4 VRP at 658. In March 2012, K.M.M. expressed reluctance to continue visitation with her parents. CP at 61. Soon after, K.M.M. began ending visits early and eventually refused visitation altogether. 1 VRP at 30.

In response to K.M.M.'s refusal to participate in visitation, the dependency court appointed family therapist Thomas Sherry in July 2012 to "render an opinion on the appropriateness of visitation, and how such visitation can occur." CP at 324. Mr. Sherry recommended a plan for "natural contact" between K.M.M. and her parents once her younger siblings were transitioned back into their mother's

---

[1] All three children were eventually placed with K.M.M.'s current foster parents. Parental rights to K.M.M.'s siblings are not at issue in this case.

custody. 2 VRP at 237-39, 321-22. The plan was to facilitate passive contact between K.M.M. and her parents that was incidental to her interactions with her siblings. *Id.* at 239.

The recommended natural contact plan was not implemented until October 2012, when K.M.M.'s younger siblings were returned to their mother's custody. CP at 61. K.M.M. expressed concern for her sisters' safety and worried about whether she would also be removed from her foster parents. 1 VRP at 152-53. K.M.M. had several natural contacts with her mother that involved minimal to no interaction. 2 VRP 325-26. Even with limited interaction, K.M.M.'s foster parents testified that she was very clingy after these visits and often regressed to baby talk. *Id.* at 194.

K.M.M.'s first and only natural contact with J.M. occurred in December 2012. *Id.* at 326. At this point, K.M.M. had not had any contact with her father for approximately eight months. K.M.M. was hiding in the back of the van when it arrived at the visitation site. *Id.* at 328. J.M. tried to engage with K.M.M. and placed his hands on her shoulders. *Id.* at 329. K.M.M. became extremely upset, and the social worker immediately terminated the visit. *Id.* K.M.M. testified that she "felt very scared" during the interaction. *Id.* at 289. K.M.M.'s foster parents recounted that K.M.M. was so upset after the incident that she was trembling and regressed to baby talk for several days following the visit. *Id.* at 195.

After the natural contact with J.M. failed, the dependency court suspended visitation with both biological parents. CP at 335. K.M.M. has not had any further contact with either D.C. or J.M.

B.    TERMINATION PROCEEDINGS

The Department first filed termination petitions for K.M.M. and her two sisters in June 2011. *Id.* at 60. A termination trial was held in February 2012, but the Department took a voluntary nonsuit after four days of testimony in order to attempt to work further with the parents to resolve their individual issues. *Id.* at 48-49, 61. Specifically, there was additional work that needed to be done to address J.M.'s mental health issues. 1 VRP at 20.[2]

Two years later, the Department again petitioned to terminate D.C.'s and J.M.'s parental rights to K.M.M.[3] CP at 1-4. Following a five-day bench trial held eight months later, the court terminated J.M.'s parental rights to K.M.M. *Id.* at 105-12, 115-38. The court found that all court-identified parental deficiencies had been corrected and all necessary services had been provided. However, the court concluded that "[b]ecause the attachment bond no longer exists" between K.M.M. and her father, J.M. is "unable to parent" her. *Id.* at 112.

---

[2] According to the foster mother's uncontested testimony in the termination proceeding presently at issue, K.M.M. was unaware of the first termination trial itself or the outcome of the trial. 2 VRP at 214.

[3] D.C. eventually relinquished her parental rights to K.M.M., and her parental rights were terminated in January 2014. CP at 171-75. D.C. is not a party to this case.

On appeal, the commissioner for the Court of Appeals affirmed the termination order, concluding that the trial court's finding that J.M. was "unable to parent" his daughter constituted an express finding of current parental unfitness. The commissioner also affirmed the trial court's finding that the Department had provided all necessary services to J.M. J.M. moved to modify the commissioner's ruling. A three-judge panel for the Court of Appeals, Division Two, granted the motion to modify and affirmed the termination order in a published opinion. *In re Welfare of K.M.M.*, 187 Wn. App. 545, 349 P.3d 929 (2015). J.M. then filed a motion for discretionary review with this court, which we granted. *In re Welfare of K.M.M.*, 184 Wn.2d 1026, 364 P.3d 119 (2016).[4]

## ANALYSIS

Our role in reviewing a trial court's decision to terminate parental rights is to determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence. *See In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Because of the highly fact-specific nature of termination proceedings, deference to the trial court is "particularly important." *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). We defer to the trial court's determinations of witness credibility and the persuasiveness of the

---

[4] J.M. filed a motion to accept additional evidence on review pursuant to RAP 9.11, which was passed to the merits. We now deny the motion and decline to accept the additional evidence submitted by J.M.

evidence, and "its findings will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record." *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). We review de novo whether the court's findings of fact support its conclusions of law. *See In re Dependency of Schermer*, 161 Wn.2d 927, 940, 169 P.3d 452 (2007).

We recognize that parents have a fundamental liberty and privacy interest in the care, custody, and companionship of their children. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). However, this right is not absolute. It is "well established that when parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child." *Id.* at 762. Furthermore, our legislature has declared that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

Chapter 13.34 RCW creates a two-step framework for terminating parental rights: first, the Department must show that it has satisfied its statutory obligations pursuant to RCW 13.34.180(1), and then it must establish that termination of parental rights would be in the child's best interests. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the adequacy of the parents, while the second step looks at the child's best interests. *Id.*

9

A petition seeking termination of parental rights pursuant to RCW 13.34.180(1) must allege all of the following:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
>
> . . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

The State must prove these allegations by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i). This requires that the ultimate facts are shown to be "'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 358 P.2d 510 (1961)).

In addition to finding that the six statutory elements of RCW 13.34.180(1) have been satisfied, due process protections require that a court make a finding of current unfitness before parental rights can be terminated. *K.R.*, 128 Wn.2d at 142 (citing *Santosky v. Kramer*, 455 U.S. 745, 747-48, 102 S. Ct. 1388, 71 L. Ed. 2d

599 (1982)). This finding need not be made explicitly. *Id.* at 142-43. Satisfying all six of the statutory elements raises an implied finding of parental unfitness. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011).

Once the court determines that the Department satisfied its requirements in accordance with RCW 13.34.180(1), parental rights may be terminated if doing so is in the best interests of the child. RCW 13.34.190(1)(b). The Department must prove that termination is in the best interests of the child by a preponderance of the evidence. *A.B.*, 168 Wn.2d at 911.

J.M. challenges the termination order on two grounds, one statutory and the other constitutional. First, J.M. alleges that his parental rights cannot be terminated because the Department failed to fulfill its statutory obligation to provide all necessary services pursuant to RCW 13.34.180(1)(d).[5] Second, J.M. claims that his right to due process was violated because the trial court failed to make a proper finding of current parental unfitness.

A.   NECESSARY SERVICES

The Department has a statutory obligation to provide all the services ordered by the permanency plan, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."

---

[5] J.M. does not challenge the trial court's findings on any other requirements of RCW 13.34.180(1).

RCW 13.34.180(1)(d). "Necessary services" are not defined in the statute, but the Department is required to specify in a permanency plan "what services the parents will be offered to enable them to resume custody." RCW 13.34.136(2)(b)(i). We have observed that "[w]hen a 'condition' precludes reunion of parent and child, as here, regardless of whether it can be labeled a 'parental deficiency,' the State must provide any necessary services to address that condition as set forth in RCW 13.34.180(1)(d)." *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The Court of Appeals has relied on this statement to define "necessary services" as those services "needed to address a condition that precludes reunification of the parent and child." *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014) (citing *C.S.*, 168 Wn.2d at 56 n.3). This definition of "necessary services" is consistent with the plain language of RCW 13.34.180(1)(d).

The trial court found that "[a]ll services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered or provided to the father with the exception of reunification services which if provided are no longer capable of providing a solution."[6] CP at 107. J.M., however, asserts that the Department failed to fulfill its statutory obligations in

---

[6] The trial court referred to "reunification services" and "reunification therapy" in its oral and written rulings. CP at 107-08; 4 VRP at 706. However, J.M. specifically alleges that he did not receive family therapy and attachment and bonding services. Pet'r's Suppl. Br. at 13.

accordance with RCW 13.34.180(1)(d) because he was never provided with reunification services, specifically family therapy and attachment and bonding services.

      1.    *Family therapy was not a necessary service because it was never an appropriate service that could have been provided to J.M.*

Although family therapy was not provided to J.M., the record shows that this service was not reasonably available to him because a plan for reunification was never recommended or implemented. According to the service providers who testified, family therapy is not offered until reunification occurs, and the record shows that J.M. never became stable enough for reunification with K.M.M. Consequently, family therapy was never reasonably available to J.M.

Following the initial termination trial in February 2012, additional services were identified for J.M. Kristopher Richardson, the second social worker assigned to K.M.M.'s case, testified that there "was a need to readdress mental health services with the father. More work needed to be done on individual-level objectives with the parents." 1 VRP at 20. According to Mr. Richardson, the Department operates within a framework of first addressing a parent's individual-level issues before providing services to address family-level issues. *Id.* at 20-21. The parent is in a better position to deal with family-level concerns once individual issues, like chemical dependency and mental health conditions, have been addressed. *Id.* at 21. Within this framework, family therapy to address J.M.'s

13

relationship with K.M.M. would not be appropriate until J.M.'s underlying mental health issues had improved.

The service providers consistently testified that J.M.'s mental health issues continued to affect his ability to parent K.M.M. Although the Department worked with J.M. to set up mental health services, J.M. had difficulty maintaining his mental health treatment. J.M. eventually had regular treatment with David Walker, but it is unknown what progress, if any, J.M. made in therapy because Mr. Walker did not testify.[7]

Consistent with Mr. Richardson's testimony, Ms. Staton stated that it was not her policy to work with biological parents in family therapy until reunification was underway. *Id.* at 68. Once a child was in the process of transitioning home, it would be appropriate to work with the biological parents because they would become "the caretakers meeting the child's needs." *Id.* at 69. She further explained that one of the prerequisites to family attachment therapy was that the parent had worked through his or her own issues enough for the child to be returned home. *Id.* at 138. This never occurred in K.M.M.'s case. *Id.*

Similarly, after meeting with J.M. and K.M.M. separately to assess whether visitation should continue, Mr. Sherry did not recommend reunification. He saw

---

[7] Jennifer Martin, the GAL, testified that although Mr. Walker was available to continue therapy, J.M. did not want to participate in therapy with him because Mr. Walker apparently refused to testify on J.M.'s behalf at the termination trial. 4 VRP at 643.

little possibility that K.M.M. would want to return to her parents' custody because she was "adamant about not wanting visitation, period." 2 VRP at 226-27. Although a dependency review hearing order did state that "[t]he father will participate in family therapy with Thomas Sherry . . . to address issues with visitation," CP at 334, Mr. Sherry clarified in his testimony that his recommendation for family therapy was not for reunification with the parents, but to "maintain the sibling relationships" once the sisters were in different placements, 2 VRP at 243, 246.

Thus, because J.M. was unable to improve his underlying mental health issues to the point where he could parent K.M.M., reunification was never more than a theoretical possibility. Neither reunification nor family therapy was ever recommended by the service providers or ordered by the dependency court. Moreover, it was never contemplated that J.M. would be K.M.M.'s primary caregiver.[8] CP at 109; 4 VRP at 653. Before the permanency plan was switched to adoption, the plan was to return K.M.M. to her mother's custody, anticipating that J.M. would have visitation with her. 4 VRP at 653. Family therapy was thus never

---

[8] The concurrence disregards these facts and fails to acknowledge that J.M. simply never reached a point at which reunification services could have been provided. Moreover, it is clear from the record that the Department did not become aware of K.M.M.'s lack of attachment until she began resisting visitation with her father, at which point it was impossible to offer the services the concurrence claims should have been offered. By attempting to shift the blame entirely to the Department's shoulders, the concurrence fails to present the facts in their entirety as they existed at the relevant time.

"reasonably available" to J.M., and it did not constitute a "necessary service" within the meaning of RCW 13.34.180(1)(d).

> 2.    *Attachment and bonding services were not necessary services because it would have been futile to provide them*

"'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" *C.S.*, 168 Wn.2d at 56 n.2 (quoting *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008)). The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided. *See In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988); *see also In re Welfare of Aschauer*, 93 Wn.2d 689, 699 n.6, 611 P.2d 1245 (1980). Given the specific circumstances in this case, the trial court correctly determined that providing attachment and bonding services would be futile because J.M. would not have benefited from the services.

Although J.M. was willing to participate in attachment and bonding services, these services would not have been able to remedy K.M.M.'s lack of attachment. K.M.M. could not tolerate interactions with her father and refused to attend visitation. Thus, as a practical matter, K.M.M. would not be a willing participant in any therapeutic services with her father. There was no way for the social workers to force K.M.M. to participate in services, short of lying to her or using physical force, which are both prohibited by department policy. 3 VRP at 448. As

the trial court observed, "[K.M.M.] herself has taken the strong position that she will not engage with her parents during visits and does not want to be a part of that family." CP at 109.

Additionally, there is no evidence in the record that attachment and bonding services could have repaired J.M.'s relationship with K.M.M. Rather, the evidence strongly supports the trial court's determination that the parent-child relationship was beyond repair and any attempt to reunify K.M.M. with her father would be detrimental and harmful to her. *Id.* Testimony from Ms. Staton and Mr. Sherry amply supports the trial court's finding that "[K.M.M.] would suffer emotional derailment of her progress, and any such attempt would likely compromise her ability to begin to establish the other social and emotional stages she needs to go through, such as developing an ability for empathy." *Id.* While it is possible that attachment and bonding services might have prevented K.M.M.'s detachment from her father had they been previously provided, we cannot go back in time to prevent the damage from occurring.

The futility of any additional services was further supported by J.M.'s demonstrated lack of empathy for K.M.M.'s needs. When asked what was in K.M.M.'s best interest, J.M. did not express any recognition that he needed to be a better parent, but instead asserted that K.M.M.'s foster parents were "hindering her return home." 3 VRP at 526. J.M. was willing to assign blame to the Department,

foster parents, K.M.M.'s therapist, and his own therapists for the fact that reunification never occurred, but he did not fully acknowledge the role that he played in K.M.M.'s continued dependency. This mindset was further illustrated by Mr. Sherry's testimony that J.M. did not seem to understand why reunification had not yet happened. 2 VRP at 236. According to Mr. Sherry, J.M.'s thinking was "more linear" in that he seemed to believe that because he had made some efforts to improve himself, reunification should be the next step. *Id.* He could not understand that K.M.M. did not want to have a connection with him any longer.

Similarly, Lisa Sinnett, a social worker assigned to K.M.M.'s case, stated that she believed "[J.M.] is unable to meet [K.M.M.]'s needs" because of his "inability to kind of understand what her needs are. He has an inflexibility in regards to that, and so he isn't able to meet her where she is at." 3 VRP at 396-97. Ms. Sinnett testified that despite lengthy conversations with J.M.,

> [he] has been unable to see things from [K.M.M.]'s point of view, in my opinion. He hasn't been able to fully understand why the length of time that she has been involved in this and that she -- what she wants in regards to what she wants long term for herself and also in regards to why she was not going to continue with the sibling visits, so a lack of understanding and insight into her needs.

*Id.* at 397-98. J.M.'s inability to meet K.M.M. "where she is at," *id.* at 397, was exemplified by the failed natural contact. J.M. overwhelmed K.M.M. against the

social worker's instructions and did not understand why the interaction was so traumatic and upsetting for his daughter. 2 VRP at 326, 330.

Furthermore, because he had not addressed his underlying mental health issues, J.M. "hasn't become ready to support [K.M.M.]'s attachment to him." 4 VRP at 664. J.M. had been unable to maintain regular mental health treatment, and there was no evidence that he would be able to in the future. In fact, his testimony at trial suggested an unwillingness to continue with mental health services, which he described as "a waste of time and money and waste of energy." 3 VRP at 496. Unfortunately, as long as J.M.'s mental health issues remain untreated, attachment and bonding therapy would be ineffective.

"[A] parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *Ramquist*, 52 Wn. App. at 861. Furthermore, a parent's lack of insight into his own condition and the child's needs is relevant to assessing whether the parent would benefit from additional services. *See In re Welfare of H.S.*, 94 Wn. App. 511, 528, 973 P.2d 474 (1999) (citing *Krause v. Catholic Cmty. Servs.*, 47 Wn. App. 734, 747, 737 P.2d 280 (1987)). Thus, in light of J.M.'s unwillingness to take advantage of the services that had already been provided to him, the Department was not required to provide additional services.

###### 3. *Providing additional services would not remedy J.M.'s parental deficiencies within the foreseeable future*

Even in instances where the Department inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future. *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). The "'foreseeable future'" is determined from the point of view of the child. *Hall*, 99 Wn.2d at 851. Here, the trial court concluded that even if attachment and bonding services could remedy the lack of attachment between J.M. and K.M.M., "there is no reasonable probability that reunification therapy, or any other kind of therapy, can remedy [the severed parent-child bond] *within the foreseeable future.*" CP at 108 (emphasis added). There is substantial evidence in the record to support this conclusion.

The testimony was consistent about K.M.M.'s need for immediate stability and permanence. Ms. Staton, who has worked with K.M.M. since almost the beginning of dependency, testified that K.M.M. "has a lot of anxiety over what is going to happen, whether or not she is going to be able to be adopted, or whether or not she is going to be returned." 1 VRP at 92. Ms. Staton further testified that this fear and anxiety is already "delaying [K.M.M.] from entering this new developmental stage in a healthy way." *Id.* at 92-93. Ms. Staton opined that K.M.M. had a short-term need for permanency so that she could "let go of this fear" and "move on to the next developmental stage." *Id.* at 93. According to Ms.

Staton, K.M.M. would need to maintain her secure attachment to her foster parents in order to move forward in her development. *Id.* at 141.

K.M.M. herself was clear about the fact that she did not want to be reunited with her parents. K.M.M. testified that she did not want to live with her biological parents and wanted to be adopted by her foster parents.[9] 2 VRP at 285, 303. K.M.M. expressed this desire to the adults around her. Mr. Sherry testified that it became clear from their first meeting that K.M.M. was "adamant" about not wanting visitation with her parents. *Id.* at 226-27. Mr. Richardson testified that he had never had a case where a child had "drawn a line in the sand" to the same extent as K.M.M. 1 VRP at 54. Jennifer Martin, the GAL, explained that "[K.M.M.], as an older child and having grown up over the last . . . four and a half years, she has [begun] to develop an identity, and that identity is separate from her parents." 4 VRP at 665.

---

[9] It is worth noting that pursuant to RCW 26.33.160(1)(a), a child's consent to adoption is required if the child is 14 years of age or older. This suggests that the legislature recognizes that children, particularly children at K.M.M.'s age, should have a say in what happens to them. The value of this child-centered approach is supported by amici curiae Center for Children & Youth Justice et al., who observe that "[t]here is evidence to suggest that a child's chances of success in a placement are improved when a youth feels comfortable and safe in their placement." Br. of Amici Curiae Ctr. for Children & Youth Justice, Mockingbird Soc'y, & Children & Youth Advocacy Clinic at Univ. of Wash. Sch. of Law (Br. of Amici Curiae CCYJ) at 10-11. In this case, K.M.M. has repeatedly asked why no one listens to her with regard to what she wants. 4 VRP at 665. The importance of considering K.M.M.'s point of view is underscored by the testimony that disregarding K.M.M.'s adamant desire to be adopted by her foster parents would be detrimental to her sense of self. 2 VRP at 272.

There was no evidence that the parent-child relationship could be repaired. And even if an attachment between J.M. and K.M.M. could be restored, there was no reason to believe that this would be possible within a time frame that would be conducive to K.M.M.'s emotional development and well-being. Therefore, based on the unique facts presented by this particular case, we find substantial support for the trial court's conclusion that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided" in accordance with RCW 13.34.180(1)(d).

4. *There is no requirement for identical services between foster parents and noncustodial parents*

J.M. asserts that K.M.M.'s foster parents were provided with attachment and bonding services that allowed them to form an attachment with her. The foster parents received instructions to treat K.M.M. like a much younger child in order to address her developmental delays, which included rocking her in a blanket. 1 VRP at 101-02. Relying on *C.S.*, 168 Wn.2d 51, J.M. asserts that offering services to the foster parents but not to him constitutes a failure to provide all necessary services as required by RCW 13.34.180(1)(d). However, contrary to J.M.'s interpretation, *C.S.* does not stand for the proposition that noncustodial parents must receive services identical to the foster parents.

In *C.S.*, the mother had not been provided with the same training as the foster mother to manage the child's behavioral problems. *Id.* at 56. The foster mother was able to successfully care for the child after the services were offered. *Id.* at 55-56. The crux of the decision in *C.S.* was that the mother was not provided with reasonably available services that could have helped her parent her child. While the fact that foster parents receive certain services may be evidence of reasonable availability, it does not create an inflexible requirement that noncustodial parents receive identical services. As the primary caregiver, a foster parent has a fundamentally different relationship with a dependent child than a noncustodial parent. The services needed by the foster parents to adequately care for a child will likely be different from what may be reasonably available to a parent in many cases.

This is precisely what the facts before us demonstrate. Ms. Staton testified that the foster parents were involved in K.M.M.'s therapy only because they were her primary caregivers. 1 VRP at 68. The goal of K.M.M.'s individual therapy was to help her form healthy attachments to adults generally, not to her foster parents specifically. The hope was that once K.M.M. formed an attachment to her foster parents, she would be able to transfer that attachment to her parents if the time for reunification ever arrived. *Id.* at 71-74. Moreover, because K.M.M. could

no longer tolerate contact with J.M., his involvement in K.M.M.'s individual therapy was neither possible nor appropriate.

B.    CURRENT PARENTAL UNFITNESS

The trial court concluded that J.M. was "unable to parent" K.M.M. due to her lack of attachment to him and his inability to remedy that lack of attachment at the time of trial. J.M. contends that this does not constitute a finding of current parental unfitness, and even if it did, the facts are not sufficient to support such a finding. J.M. further asserts that the trial court implicitly found that he was fit when it concluded that all parental deficiencies had been remedied and his inability to parent was not due to any fault on his part. We hold that the trial court did properly find J.M. was currently unfit to parent K.M.M. at the time of trial.

This court has previously stated that the first part of the termination proceeding focuses on the adequacy of the parent, and it is "'premature'" to consider the child's best interests before resolving the question of parental unfitness. *A.B.*, 168 Wn.2d at 925 (quoting *In re Welfare of Churape*, 43 Wn. App. 634, 639, 719 P.2d 127 (1986)). Applying this principle, J.M. argues that the unfitness inquiry is limited to the qualities of the parent and cannot look "to outside circumstances that already inform other termination elements." Pet'r's Suppl. Br. at 11. In J.M.'s view, by finding that he was currently "unable to parent" K.M.M. due to the lack of a bond between them, the trial court improperly

considered factors beyond his personal characteristics in determining parental unfitness.

While it is true that the best interests of the child inquiry is a different and separate consideration from parental unfitness, the statute and case law do not support the argument that the parental unfitness inquiry is limited solely to consideration of the parent's deficiencies. The parent-child relationship necessarily involves *both* the parent and the child; thus, it is necessary to consider whether a parent is capable of parenting the particular child given the child's specific, individual needs. This approach is supported by a plain reading of the statute and case law interpreting "unfitness" as applied to chapter 13.34 RCW.

1.    *A plain reading of RCW 13.34.180 and related statutes demonstrates that the unfitness inquiry goes beyond a parent's deficiencies*

There is no statutory definition of "unfitness," but the statutory elements of RCW 13.34.180(1) "necessarily and implicitly include[] evidence of current parental unfitness." *K.R.*, 128 Wn.2d at 142. In other words, the elements of RCW 13.34.180(1) form the factual basis for a finding of parental unfitness. If any requirement of RCW 13.34.180(1) is not satisfied by clear, cogent, and convincing evidence, then termination of parental rights is not permissible. Along the same lines, if all of the requirements of RCW 13.34.180(1) have been met, there is an implied finding of parental unfitness. *Id.* Thus, examining the scope of the

statutory requirements provides insight into what may be properly considered when determining parental unfitness.

While RCW 13.34.180(1)(d) looks specifically at a parent's deficiencies, RCW 13.34.180(1)(e) more broadly requires "[t]hat there is little likelihood that *conditions* will be remedied so that the child can be returned to the parent in the near future." (Emphasis added.) "Where the statute's meaning is plain and unambiguous, we derive legislative intent from the statute's plain language." *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 238, 237 P.3d 944 (2010) (citing *City of Seattle v. St. John*, 166 Wn.2d 941, 945, 215 P.3d 194 (2009)). Here, "conditions" is a broad term that is capable of encompassing all relevant facts and circumstances. If the legislature had intended to limit the "conditions" that may be considered when determining parental unfitness to specific "parental deficiencies," then it could have used appropriately specific language. Because it did not do so, limiting an unfitness inquiry to parental deficiencies would draw a narrower scope than the legislature intended. The argument that "conditions" extends beyond "parental deficiencies" is further supported by language instructing that "[i]n determining whether the conditions will be remedied the court *may consider, but is not limited to*," the factors specifically enumerated in the provision. RCW

13.34.180(1)(e) (emphasis added).[10] Furthermore, RCW 13.34.180(1)(f) provides that termination is appropriate where "continuation of the *parent and child relationship* clearly diminishes the child's prospects for early integration into a stable and permanent home." (Emphasis added.) This necessarily requires consideration of the specific parent-child *relationship*, rather than just the parent's deficiencies.

Thus, considering the statutory language in context, it appears that the legislature did not intend for parental unfitness to be considered in isolation, as J.M. contends. Rather, the totality of the parent-child relationship is already part of the unfitness inquiry.

2.    *Courts already consider the specific parent-child relationship when determining unfitness*

Case law also demonstrates that in appropriate circumstances, courts will look beyond the existence of general parental deficiencies when making unfitness determinations to consider whether the parent is able to provide for the specific child's basic, individual needs. In *Aschauer*, 93 Wn.2d at 693, for example, we

---

[10] Amici advocate for the position that where continuation of a parent-child relationship would be significantly detrimental to the child's social and emotional development, "that fact is and should be deemed a parental deficiency under the statute at the time of trial." Br. of Amici Curiae CCYJ at 10. Whether the circumstances are characterized as a "parental deficienc[y]" pursuant to RCW 13.34.180(1)(d) or a "condition[ ]" pursuant to RCW 13.34.180(1)(e), our case law is consistent with the proposition that the focus of the inquiry should be determining if the nature of the parent-child relationship constitutes a barrier to reunification. *See C.S.*, 168 Wn.2d at 56 n.3.

upheld a termination order, finding that "[t]he record is replete with evidence that the persons who had the care and custody of the children from the time of their infancy *had not had the ability to meet their physical and emotional needs*." (Emphasis added.) Although the "the parents did their best to care for the children," the evidence demonstrated that "both parents were incapable of giving them the care that they needed." *Id.* at 694. This conclusion was not based solely on a general parental deficiency, but on the specific context of the parent-child relationship at issue in that case. The mother was unable to cope with her own serious mental health condition, let alone the needs of two children with severe physical, emotional, and social developmental delays. *Id.* In light of that specific context, we held that "[t]he mother, while she undoubtedly loves the children also and desires to have them with her, has been found, upon substantial evidence, to be likewise incapable of nurturing them." *Id.* The analysis in *Aschauer* demonstrates that the proper inquiry is whether the parent is able to provide care for the child actually involved, not merely whether parental deficiencies exist in the abstract.

Similarly, the Court of Appeals has held that the fact that a parental deficiency exists is not necessarily sufficient to show unfitness. For example, Division One stated that "mental illness is not, in and of itself, proof that a parent is unfit or incapable. The court must examine the relationship between the mental

condition and parenting ability." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005). In other words, the deficiency must affect a parent's ability to adequately care for a child. Along the same lines, Division Three observed that "[t]he court considers behavior manifesting mental illness within the totality of the circumstances" when determining whether a parent is unfit. *H.S.*, 94 Wn. App. at 528 (citing *In re Welfare of Hauser*, 15 Wn. App. 231, 235, 548 P.2d 333 (1976)). The court further stated that "[a] child should not be left in the custody of a parent whose mental illness renders the parent unable to understand or meet the needs of the child." *Id.* (citing *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979)). These cases demonstrate that unfitness is not coextensive with the existence of a parental deficiency. A deficiency rises to the level of parental unfitness when it interferes with the parent's ability to provide for the child's basic health, safety, and well-being.

An unfitness inquiry that extends beyond the existence of parental deficiencies to consider the specific parent-child relationship at issue is also consistent with how "unfitness" is examined in the context of other sections of chapter 13.34 RCW. With regard to nonparental custody petitions, we have previously stated that "[a]n unfit parent generally cannot meet a child's basic needs and, in such cases, the State is justified in removing the child from the home and, in certain cases, permanently terminating parental rights." *In re Custody of*

29

*Shields*, 157 Wn.2d 126, 142, 136 P.3d 117 (2006). We echoed this same conception of "unfitness" more recently in *In re Custody of B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013) ("A parent is unfit if he or she cannot meet a child's basic needs."). And in dependency cases, we have recognized that a showing of parental deficiency is not the same as proving parental unfitness. *Schermer*, 161 Wn.2d at 943 (citing *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992)).

These cases support the argument that the mere existence of a parental deficiency does not necessarily determine whether a parent is currently unfit. Conversely, we reject the argument that remedying general parental deficiencies is dispositive in determining whether a parent is currently unfit to parent a *particular* child. The proper inquiry is whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety. *See In re Welfare of A.B.*, 181 Wn. App. 45, 61, 323 P.3d 1062 (2014). Not all children have the same basic needs; a child with attention deficit disorder, for example, will have needs that are specific to managing that disorder. *See C.S.*, 168 Wn.2d at 55. Thus, in order to determine whether a parent is a fit parent *to a*

*particular child*, the court must determine that the parent is able to meet that child's basic needs.[11]

Applying the foregoing analysis to the facts at hand, there is substantial evidence to support the trial court's conclusion that J.M. was unable to parent K.M.M. The trial court correctly determined that the Department had discharged its statutory obligations under RCW 13.34.180(1). Despite receiving all necessary available services, J.M. remains unable to parent K.M.M. due to a lack of attachment. There is no evidence that any additional services would remedy this condition within K.M.M.'s foreseeable future. The totality of these circumstances is sufficient to support a finding of current parental unfitness.[12]

---

[11] Like J.M., amicus King County Department of Public Defense asks us to look at a parent's deficiencies in a vacuum when determining parental unfitness. Br. of Amicus Curiae King County Dep't of Pub. Def. at 4 ("the parental unfitness inquiry must focus on the *parent* and not on the child"). The unfitness inquiry is not as rigid as the briefing contends. More to the point, we do not hold that the best interests of the child should be able to overcome a parent's constitutionally protected rights—the case law is clear on this point. However, the particular facts of this case illustrate why an unfitness inquiry that fails to look at the specific parent-child relationship may not only be unfair, but could result in harm to the child. Reducing termination proceedings to a simple matter of parental rights versus the best interests of the child ignores the fact that the rights of both sides are, more often than not, interrelated in complicated ways that require individual and specific consideration.

[12] As required by RCW 13.34.190(1)(b), the trial court concluded that termination was in K.M.M.'s best interests. There is substantial evidence to support the trial court's conclusion. Because J.M. did not assign error to this conclusion on appeal, we do not address this issue further.

CONCLUSION

A court's decision to terminate parental rights is rarely ever an easy one to make. "Courts are always reluctant to deprive parents of rights with respect to their children, and it is particularly sad when the parent cares for the child and desires to be a good parent, as appears to be the case here." *Aschauer*, 93 Wn.2d at 695. J.M.'s efforts to correct his parental deficiencies and retain his parental rights are commendable, but "the court may not accommodate the parents' rights when to do so would ignore the basic needs of the child." *H.S.*, 94 Wn. App. at 530.

Unfortunately, as the trial court here observed, "no one had a crystal ball in this case." CP at 107. No one could have foreseen how the confluence of events would lead to K.M.M.'s complete detachment from her father. The sad fact remains that his daughter no longer feels a bond of attachment to him, nothing could have been done at the time of trial to repair the severed parent-child bond, and any efforts to do so would cause actual harm to K.M.M.

The alternative to termination is not placing K.M.M. back in her father's custody, but the continuation of her dependency, which has already spanned almost seven years. The mental health experts and social workers who know K.M.M. best all testified unequivocally that a continued lack of stability and permanence would likely cause serious delays in her development. To borrow sentiments from the

Court of Appeals, "No child should languish for years in foster care. [K.M.M.] should be freed to move on with her life." *H.S.*, 94 Wn. App. at 530.

Based on the totality of the circumstances presented by the particular facts in this case, we affirm the Court of Appeals.

_____
                                    Yu, J.

WE CONCUR:

_____          _____
Madsen, C.J.                                       Stephens, J.

_____          _____
Johnson, J.

_____          _____
Owens, J.                                          González, J.

_____          _____

34

No. 91757-4

FAIRHURST, J. (concurring)—Before a parent's fundamental rights can be terminated, the Department of Social and Health Services (Department) has the burden to prove by clear, cogent, and convincing evidence that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d), .190(1)(a)(i). The Department has failed to offer or provide certain services that were "'needed to address a condition that precludes reunification of the parent and child'"—namely, services designed to address the failing attachment bond between the father, J.M., and his daughter, K.M.M. Majority at 12 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014) (citing *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010))).

The trial court acknowledged that J.M. never received certain necessary services, finding that "[a]ll services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered or provided to the father *with the exception of reunification services*." Clerk's Papers (CP) at 107 (emphasis added). Based on the record and the trial court's findings, the

1

Department's failure to provide such services contributed to K.M.M.'s detachment from her father: "In 2011, the relationship between [K.M.M.] and her father was at a critical juncture and the provision of reunification therapy at that time may have prevented her from extinguishing her attachment to her father." CP at 108.

But instead of providing the opportunity for J.M. to repair this relationship with relevant services, the Department worked on K.M.M.'s attachment issues through her individual therapy, which her foster parents were invited to participate in. Ultimately, K.M.M. refused to engage with her biological family and instead identified only with her foster parents, which "severed" the "parent child relationship" and "attachment bond" between J.M. and K.M.M. CP at 108; *see also* CP at 127-28 ("[T]he tenuousness of her attachment to her father during that time period was more easily extinguished because she was working hard on facilitating attachments with adults, who happen to be her foster parents.").

Despite J.M.'s need for reunification services (particularly regarding attachment and bonding) during a critical point in K.M.M.'s dependency, the trial court concluded that the Department met its burden under RCW 13.34.180(1)(d) because, by the time of the termination proceedings, K.M.M.'s detachment from her father had exacerbated to the point that additional services could not remedy their relationship, at least not without severely harming K.M.M. The majority upholds this decision.

2

I write separately because I am concerned that this emphasis on the harmfulness of reunification therapy and services *at the time of the termination trial* allows the Department to avoid its statutory duty to provide services at a time when they would be most helpful to promoting family reunification, then terminate parental rights based on circumstances that may have been avoided had the Department timely fulfilled its duty to provide services.

The majority holds that attachment and bonding services were not "necessary services" under RCW 13.34.180(1)(d) because it would be futile for the Department to offer them. Majority at 16. The majority focuses on three major reasons to support its conclusion of futility. First, the majority asserts that K.M.M.'s detachment from her father was so severe by the time of the termination trial that no further services could remedy that relationship, at least not without harming K.M.M. *Id.* Second, the majority claims that J.M.'s lack of empathy toward K.M.M.'s needs rendered additional services futile. *Id.* at 17. Third, the majority points to J.M.'s mental health issues as evidence that "attachment and bonding therapy would be ineffective." *Id.* at 19. I cannot agree that these rationales support a finding of futility given the Department's failure to even *offer* attachment and bonding services and considering J.M.'s willingness and demonstrated completion of all other necessary services.

3

1.      Timeliness of reunification services

It is undisputed that K.M.M. had special needs involving her attachment to adults and that J.M. was never offered any sort of attachment and bonding services that would allow him to adequately respond to those needs. The majority admits that J.M. was willing to participate in such services, but claims that it is simply too late now. By jumping so quickly to a conclusion of futility, the majority fails to take into account significant factors, such as J.M.'s willingness and ability to complete all services, the crucial need for such services during the dependency, and the effect that the Department's failure to offer those services had on K.M.M.'s detachment from her father. The majority also seems to expand the scope of the judicially created futility doctrine.

The trial court repeatedly emphasized that its decision to terminate parental rights had nothing to do with J.M.'s parental deficiencies. CP at 108 ("[i]t is not due to parental deficiencies" that K.M.M. would no longer engage with her biological family; "[t]hrough no fault of the father, [K.M.M.] had taken the strong position that she did not want to engage in visitation"), 109 ("The lack of the attachment bond is not due to any of [J.M.]'s parental deficits. [J.M.]'s parental deficits have been corrected. The father here has successfully participated in the court ordered rehabilitative services and has remedied these individual parental deficits."). According to the trial court, "The record is replete with the father's willingness to

4

enter into, to attend, make progress in, and complete all of the services that were offered to him by the State." CP at 120. The trial court also concluded that J.M. was an "appropriate parent" to his other daughter. CP at 109, 133.

J.M. worked hard to complete all of the services the Department offered, and he remedied all of his parental deficiencies, yet ultimately his parental rights were still terminated without the Department ever offering him necessary attachment and bonding services. Given J.M.'s positive history of completing all services, the Department cannot now claim that attachment and bonding training would be futile when it did not even attempt offering him that sort of therapy. The majority's conclusion that additional services would be futile disregards essential aspects of our futility doctrine and creates a new exception.

The majority's own definition of "futile" states, "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been *offered or provided.*" Majority at 16 (emphasis added). Based on this definition, a service cannot be futile when the Department has never even offered it. Similarly, in *B.P.* we noted that the futility rule "derives from cases in which the State made repeated offers of services but eventually gave up after the parent refused to accept any of those offers." *In re Parental Rights to B.P.*, ___ Wn.2d ___, 376 P.3d 350, 362 n.5 (2016). In that case, we reversed a termination order under RCW 13.34.180(1)(d) for failing to provide necessary attachment and

5

bonding services. We noted that such services would not be futile where the parent had "accepted every offer of services and did exceptionally well" in the limited services that the Department did provide to address the parent's relationship with the child. *Id.*

Based on these definitions of "futility," I cannot say that attachment and bonding services would be futile in this case given J.M.'s dedication to all other services offered and the Department's undisputed failure to ever offer such services, especially during a time period that the trial court identified as "critical" to saving the parent-child relationship. CP at 108, 118, 127, 134.

Notably, the Department's failure to timely provide attachment and bonding services contributed to K.M.M.'s detachment from her father. Although K.M.M. expressed a desire to be adopted and that she no longer wanted to see her biological parents at a time when visits and services with her parents were still ongoing, K.M.M.'s counselor failed to advise the Department about these sentiments or to explore possible need for attachment or reunification services for the biological parents. CP at 126. The trial court's written findings explain that the Department offered services for K.M.M. to develop secure attachments to adults, but then she ultimately attached only to her foster parents and severed her relationship with her biological parents. CP at 107-08.

6

As the trial court's oral ruling explains more fully, the Department's failure to offer reunification therapy for J.M., particularly considering K.M.M.'s individual therapy that encouraged attachments to her foster parents, directly impacted K.M.M.'s detachment from J.M. *See* CP at 129 (K.M.M.'s refusal to visit her biological parents "is a circumstance . . . or a combination . . . of a lapse of time, not striking while the iron was hot, in terms of getting reunification therapy started in 2011[,] . . . and the focus of all of the therapy, which was to facilitate [K.M.M.] to shore up and encourage her to form secure attachments with adults."), 134 ("[T]here was a failure to provide reunification therapy at a critical juncture[;] . . . because there was that failure, [K.M.M.] was allowed to form a strong attachment bond with her foster parents such that . . . that relationship between her dad and her cannot now be repaired without great harm being caused to [K.M.M.]."), 134-35 ("The relationship is not due to a parental deficiency today. It is due, as I said, to that earlier moment in time, which was missed in terms of the ability for [K.M.M.] and her dad to reunify."); *see also* CP at 118 (the critical services "capable of correcting the parental deficiencies within a foreseeable future were not provided at a time when those deficiencies or those problems could have been corrected").

I am deeply troubled that the Department's failure to provide necessary attachment and bonding services in a timely manner appears to be the main reason that reunification is no longer available between this parent and his child. In contrast

to the cases in which the Department has offered services but the parent refuses to take advantage of them, there are no such grounds for a finding of futility here.[1]

2.     Empathy

The second reason the majority claims that attachment and bonding services would be futile involves J.M.'s supposed "lack of empathy for K.M.M.'s needs." Majority 17. However, the examples cited by the majority point more to J.M.'s lack of *understanding* of K.M.M.'s unique needs and how he should respond to them. This is exactly why additional services are necessary, not a reason to claim that they would be futile. *See* 1 Verbatim Report of Proceedings (VRP) (Oct. 29, 2013) at 112 (explaining that family therapy can help a parent to meet the child's emotional needs). From the record, it appears that understanding K.M.M.'s specialized needs was a prerequisite for any adult hoping to establish a parental bond with her. *See* 1 VRP at 67. As we stated in *C.S.*, "When a 'condition' precludes reunion of parent and child, as here, regardless of whether it can be labeled a 'parental deficiency,' the

---

[1] *See, e.g., In re Welfare of Aschauer*, 93 Wn.2d 689, 699 n.6, 611 P.2d 1245 (1980) (stating that offering services would be futile because "the mother was unwilling to move from Portland, and thus the department could not effectively offer her services"); *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983) ("This is not a case where a parent refused services or referrals which were actually offered." (citing *In re Jones*, 436 N.E.2d 849, 853-54 (Ind. App. 1982))); *In re Welfare of M.R.H.*, 145 Wn. App. 10, 26, 188 P.3d 510 (2008) (finding services futile "[w]here the Department offers services but the parent refuses to participate").

State must provide any necessary services to address that condition as set forth in RCW 13.34.180(1)(d)." 168 Wn.2d at 56 n.3; *accord B.P.*, 376 P.3d at 361.

I find it notable that the Department offered K.M.M.'s foster parents some sessions on "how to meet her needs" and "attachment," but J.M. did not receive such services. *See* 1 VRP at 99-101. I agree with the majority that the Department is not necessarily obligated to provide biological parents with services that are "identical" to those provided to foster parents. Majority at 22. However, in *C.S.*, a case that is in many ways analogous to the one at issue, we reasoned that when the Department recognizes that certain available services are necessary and capable of remedying the very deficiency that is preventing reunification and the Department fails to offer those services to the biological parent when the same services have been offered to the foster parent, termination is improper. 168 Wn.2d at 55-56.

In that case, the child, C.S., was diagnosed with attention deficit hyperactivity disorder, oppositional defiant disorder, obsessive-compulsive disorder, and sensory integration disorder, all of which made it difficult for adults to manage C.S.'s behavior at times. *Id.* at 55. The foster mother faced various difficulties in controlling C.S. until the Department placed C.S. on medication and provided the foster mother with training on how to effectively manage C.S. *Id.* at 55-56. The combination of medication and proper training proved successful. *Id.* at 56. Although C.S.'s biological mother had remedied the underlying parental deficiencies that justified

the dependency, the Department did not offer her the same services because it believed the services would be futile. *Id.* at 56 n.2. The trial court acknowledged that the biological mother had remedied her parental deficiencies but nevertheless terminated the biological mother's parental rights, finding that she "lacked 'the patience, presence of mind, skills, experience, time in a day, and availability to care for [C.S.]—given his special needs,' and these conditions showed there was little likelihood C.S. could be returned to [his biological mother] in the near future." *Id.* at 55. We reversed, holding that because medication and training were necessary to address C.S.'s behavioral problems regardless of who was caring for him, and because the training was not offered to his biological mother, RCW 13.34.180(1)(d) had not been met and termination was improper. *Id.* at 56. The fact that the Department provided training for his foster parent and medication for C.S. in order to control C.S.'s behavior indicated that proper services were not only available, but that they were necessary in order to permit *any* adult to care for C.S. and his special needs.

Like the mother in *C.S.*, J.M. completed every offered service and remedied each parental deficiency underlying the initial dependency and termination. CP at 109. Importantly, according to K.M.M.'s therapist's testimony, the attachment and bonding services that K.M.M. received and her foster parents were able to participate in were essential for K.M.M. to form healthy attachments to adults and for her foster

10

parents to be able to understand and address K.M.M.'s behavior. 1 VRP at 67-68, 106; *see also* CP at 107. In other words, attachment and bonding services were required in order to address K.M.M.'s unique issues, and therefore should have been deemed "necessary" under RCW 13.34.180(1)(d). As in *C.S.*, the fact that certain services (here, attachment and bonding services) were available to K.M.M.'s foster parents and proved successful in addressing K.M.M.'s behavioral and attachment issues indicates that such services were not only available to J.M., but that the services may have been successful had they been timely provided to J.M. Unlike the majority, I do not blame J.M.'s misunderstanding of his daughter's needs on his lack of empathy, but rather on the Department's failure to provide training and services for J.M. to understand and address her unique needs.

3.  Mental health

Finally, the majority suggests that it would have been futile for the Department to offer additional services because J.M. failed to complete mental health treatment. However, this conclusion is directly contradicted by the trial court's findings. Although the trial court acknowledged J.M. may have had some mental health issues, the court found that his mental health needs and treatment were wholly distinct from his parenting capabilities. CP at 107, 121-24, 132. In addition, the trial court repeatedly emphasized that J.M. completed *all* services offered that were relevant to his parental deficiencies. CP at 109, 120. Substantial evidence in

11

the record supports these findings. Given the unrelatedness of J.M.'s mental health and his successful track record in all relevant services, I would not find the provision of additional services futile. *See C.S.*, 168 Wn.2d at 56 (disavowing the Department's argument that additional services would be futile when biological mother had complied with all offered services, remedied underlying parental deficiencies, and was not offered services that could have permitted reunification).

4.    Conclusion

I cannot agree that the Department fulfilled its burden of providing necessary services under RCW 13.34.180(1)(d) by showing that additional services would be futile due to J.M.'s empathy or mental health issues. Despite all efforts on J.M.'s part, the court has terminated parental rights because the severed parent-child relationship between K.M.M and J.M. is now beyond repair. I am very concerned that K.M.M.'s detachment from her father was exacerbated by the Department's failure to provide necessary services in a timely manner.

However, I recognize that under the express terms of RCW 13.34.180(1)(d), necessary services must be "capable of correcting parental deficiencies *within the foreseeable future.*" (Emphasis added.) At the termination proceeding, testimony from the mental health experts and other witnesses consistently agreed that the lack of attachment between J.M. and K.M.M. was so severe that there were no longer any services available that could promote reunification. *See* CP at 108 (noting the

12

"severed" parent-child attachment bond and stating, "Everyone has agreed and testified that there is no reasonable probability that reunification therapy, or any other kind of therapy, can remedy this situation within the foreseeable future"). Based on the language of RCW 13.34.180(1)(d), which requires "necessary services" to be capable of remedying deficiencies "within the foreseeable future," coupled with the consistent agreement that no services could repair the attachment bond once it was severed, I must reluctantly affirm the termination order. Despite the Department's failure to provide essential services at a time when they could have helped promote reunification, I cannot ignore the legislature's choice to include the term "within the foreseeable future" with its definition of "necessary services" and the reality that there are no longer any services that could correct the severed parent-child bond. Therefore, I must ultimately concur in the majority's decision to affirm the termination order, but not without emphasizing J.M.'s commendable efforts in attempting reunification and expressing my frustration and disappointment with the Department's failure to provide essential reunification and attachment services at a time when they may have preserved and strengthened the now failed bond between K.M.M. and J.M.

13

Fairhurst, J.

Geon McCal, J.

Wiggins J.

14