**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Welfare of B.H. and G.H., | No. 54304-4-II |
| | (Consolidated) |
| Minor Children. | No. 54314-1-II |
| In the Matter of the Welfare of G.H., | UNPUBLISHED OPINION |
| A Minor Child. | |

WORSWICK, J. — T.H. appeals a juvenile court's denial of his motion to vacate a default judgment terminating his parental rights to his two children. He argues that the juvenile court abused its discretion and denied him due process. T.H. had failed to appear at a termination hearing, and the juvenile court entered an order of default pending a later evidentiary hearing on termination. T.H. became incarcerated before this termination hearing. While T.H. was still incarcerated, the juvenile court held an evidentiary hearing and terminated T.H.'s parental rights. T.H. later obtained legal representation and moved to vacate the default order and default judgment, but the juvenile court denied his motion. Because the juvenile court did not abuse its discretion in denying T.H.'s motion to vacate and because T.H.'s due process rights were not violated, we affirm.

No. 54304-4-II
Cons. No. 54314-1-II

FACTS

I. BACKGROUND

T.H. is the biological father of B.H., born in 2010, and G.H., born in 2007. In July 2017, while B.H. and G.H. were in the physical care of their father and living in the home of their paternal grandmother, the Department of Children, Youth, and Families placed B.H. and G.H. into protective custody, deeming their living situation to be "completely unsafe." Clerk's Papers (CP) at 90, 53. The children were later found to be dependent and were placed in foster care. Michael Wenndorf, a social service specialist with the Department, was the assigned social worker on the case.

T.H. was released from incarceration in July, 2018.[1] Approximately six months later, in January 2019, the Department filed petitions to terminate T.H.'s parental rights to both B.H. and G.H. The petitions asserted that although T.H. had been incarcerated for significant periods of time during the dependency, such incarceration had not been a barrier to T.H.'s ability to demonstrate that he had a "meaningful role in the child's life during the dependency." CP at 6. However, T.H. had failed to maintain a meaningful role in his children's lives despite opportunities to do so. The petition alleged that T.H.'s deficiencies included "unresolved issues around: substance abuse; mental health; domestic violence victimization; limited parenting skills; lack of stability; lack of involvement with child[ren]; long-term/frequent incarceration; lack of

---

[1] The record is unclear as to when T.H. was placed in incarceration.

understanding of [children's] needs." CP at 5. During January, T.H. became noncompliant with his probation, and a warrant was issued for his arrest. T.H. also incurred new criminal charges.

In February, Wenndorf personally served T.H. with notices and summonses and petitions for termination of his parental rights. The notices and summonses informed T.H. that a fact-finding hearing would be held on March 22, 2019, that T.H. was required to attend the hearing, and that his absence could result in permanent termination of his parental rights. The notices further instructed T.H. of his parental rights in a termination proceeding, including his right to counsel at public expense. The documents instructed T.H. to contact the Department if he wished to have a lawyer appointed.

Later in February, T.H. notified the Department by text message that he was in chemical dependency treatment and "on blackout," meaning he was unable to use electronic communications or have visitors. CP at 66. On March 12, T.H. sent an email to the Department stating that he was at American Behavioral Health Systems (ABHS), an inpatient treatment facility in Chehalis. He claimed to have special permission to use e-mail communications while at ABHS. T.H. stated that he could not attend the March 22 hearing due to being in treatment. Wenndorf, in what was the first of many attempts to obtain verification of T.H.'s treatment at ABHS, asked T.H. to sign a release of information for verification of participation in the program, but no release was ever signed.

On March 13, Wenndorf called T.H. at an arranged time, but T.H. did not answer. On March 14, Wenndorf spoke with a program supervisor at ABHS, who advised Wenndorf they could not confirm or deny that T.H. was in the facility. When Wenndorf explained that T.H.

reported being at ABHS, and had been e-mailing him, the supervisor told Wenndorf that "at no time would a patient be allowed access to a personal cell phone for texting or emailing." CP at 67.

On March 20, T.H. sent Wenndorf a series of text messages stating that T.H. was leaving treatment. T.H. further stated that he was "in the Olympic forest outside of Olympia," and he made comments alluding to suicide. CP at 67. However, on March 23, one day after the scheduled termination hearing, T.H. sent another text stating, "LOL, I'm not going anywhere." CP at 67.

## II.  MARCH 22 HEARING

Neither T.H. nor the mother of B.H. and G.H. appeared in person or through counsel at the March 22 hearing, but K.H., who is T.H.'s mother, appeared. K.H. told the court that T.H. could not appear because he was in an inpatient treatment program in Chehalis. The Department acknowledged that T.H. had notified Wenndorf that he was in an inpatient treatment program, and that the Department had been unable to confirm this fact because T.H. had not signed a release of information. Although the Department could have proceeded with a default termination against T.H. at that time, it instead asked the court to hold T.H. in default and set a date in the future to give T.H. "an opportunity to get in touch with Mr. Wenndorf and actually provide releases of information to demonstrate that he is in an inpatient facility." CP at 48.

The juvenile court agreed, and entered a default order against T.H. The court then scheduled a hearing for further proceedings on April 12. The court stated:

> [T.H.] needs to get in touch and if he wants an attorney appointed . . . he can get that, but then he needs to have the matter heard on the merits if he intends to contest it.
> . . . .
> . . . if he's not, . . . formally appeared in the case, appearing meaning expressing an intent to contest the case exercising his right to an attorney, something like that, then if the State wishes and they wish to present testimony…he's got three weeks to sort of get into the case if you will.

CP at 48.

The Department said that if T.H. signed a release to "confirm his status," they could "see if [sic] how differently this could go forward," implying that the Department was willing to agree to vacate the default order upon receiving verification of T.H.'s treatment. CP at 49. After the hearing, K.H. contacted T.H. and told him that the proceedings had been held over to April 12.[2]

On March 23, T.H. sent text messages to Wenndorf inquiring about a guardianship plan and asking if his children could live with K.H. Wenndorf advised T.H. to make an appointment to meet in person or speak on the phone.

On March 28, T.H. sent text messages to Wenndorf telling him that T.H.'s dependency attorney was "dropping him" and asked if that means everything can "start over." CP at 67. Wenndorf advised T.H. in a reply text message that they should meet or speak over the phone, but T.H. declined.

On April 5, T.H. texted Wenndorf that he did not know who his attorney was, and asked about his children. Wenndorf responded that they should meet or speak over the phone, but T.H.

---

[2] The hearing was later continued to April 19.

declined.  On April 7, T.H. texted Wenndorf to call him the next day.  Wenndorf called the next day but there was no answer.

On April 9, almost four weeks after the default order was entered, T.H. was arrested on the outstanding warrant issued in January.  On April 10, K.H. called Wenndorf and told him that T.H. was in custody at the Clark County Jail and that T.H. would not be able to be present at the upcoming proceedings.

### III.  APRIL 19 HEARING

On April 19, the juvenile court held an evidentiary hearing regarding the termination of T.H.'s parental rights.  At the time, T.H. was incarcerated in Clark County Jail.  Wenndorf testified about his contact with T.H. throughout the dependency process.  Although K.H. had told Wenndorf that T.H. was in custody, Wenndorf testified only about T.H.'s prior incarceration, stating that T.H. had been released from custody in February.  When asked about contact with T.H., Wenndorf testified:

> I have been involved with this case since November.  [T.H.] has been in consistent contact with the Department, um, he was in custody up until July of 2018.  He was in contact with the Department while he was in custody and then he was released from custody [inaudible, court shuffles papers] February of this year and then in February of this year [T.H.'s] contact with the Department has become very inconsistent and intermittent. . . .

CP at 54.

Wenndorf testified that the Department offered services to T.H., and also testified regarding the incarcerated parent factors.  Wenndorf described T.H.'s parental deficiencies, including his chronic substance abuse, his involvement with criminal activity, and his inability to maintain a positive, healthy relationship with the children.  Wenndorf said that the Department

had offered services to T.H. for substance abuse, mental health, parenting skills training, visitation, transportation, and housing, but that T.H.'s contact with the Department was inconsistent and intermittent, and that T.H. stopped complying with services altogether in February. Wenndorf did not notify the juvenile court that T.H. was currently incarcerated.

The juvenile court found that the Department had proven the statutory termination factors by clear, cogent, and convincing evidence and entered default judgments terminating T.H.'s parental rights to B.H. and G.H.

## IV. POST TERMINATION

On April 23, T.H. called Wenndorf from the Clark County Jail. During the call, T.H. explained to Wenndorf that he was incarcerated. T.H. asked Wenndorf how he could start the appeal process due to not being able to be present in court. Wenndorf told T.H. that he would "look into it [and] get back to [him]." CP at 80.

On May 17, T.H. was transported from the Clark County Jail to the Washington Corrections Center in Shelton, Washington. Wenndorf and T.H. met there and T.H. raised the possibility of an open adoption or a guardianship, but Wenndorf told T.H. that that possibility was foreclosed because of the default termination judgment. Wenndorf told T.H. that he could not provide him legal advice, but if we wanted to make an appeal, that "[he] would need to hurry." CP at 81. T.H. did not file a notice of appeal of either the default order, or the default termination judgments. T.H. was assigned counsel in July.

7

## V. Motion To Vacate

In September, T.H., through assigned counsel, filed and noted a motion to vacate the default judgments terminating his parental rights under CR 55(c)(1), and CR 60(b)(1), and 60(b)(3). T.H. did not specifically differentiate between the default entered on March 22 and the default termination order entered on April 19.

In support of his motion, T.H. submitted his and K.H.'s declarations. In T.H.'s declaration, he acknowledged that "[s]ome stuff is hard to remember due to my drug use." CP at 81. However, he stated that he was in ABHS "[d]etox" in Chehalis, Washington, from March 22 until March 30 or 31. CP at 78. He stated that he left ABHS and went home "around the first week of April," after he discovered that he had no medical insurance to continue treatment. CP at 78. He stated that he had planned on being at court for the termination hearing and was going to turn himself in on his warrant after the court date. He explained that he was arrested two days before the termination hearing, and while he was in jail, he made numerous attempts to reach Wenndorf, his dependency attorney who withdrew before the first termination trial date, and Department staff. K.H.'s declaration stated that on April 10, she called Wenndorf and reported to him that T.H. was in the Clark County Jail, and would be unable to be present at the termination hearing, but Wenndorf told her it was "too late." CP at 97.

Despite the default order and judgment, the Department expressed a willingness to request the termination judgment be vacated provided that T.H. produced records of his treatment on March 22. T.H. renoted his motion to vacate for December 6 without providing documentation of his treatment. Instead, he argued that the court should vacate the judgment

under the *White* factors.[3] For his evidence of a defense, T.H. claimed that "the facts as to his success or failure in drug treatment were and are developing." CP at 61. He also argued that his custody status constituted inadvertence. He also argued that he was denied his procedural due process rights to appear and defend because the Department proceeded with the termination hearing without informing the juvenile court that he was incarcerated.

The Department argued that because the juvenile court had entered an order of default after T.H. failed to appear at the March 22 hearing despite proper service, there was no violation of due process regarding the termination hearing on April 19. The Department also notified the court that T.H. had said that he was out of treatment prior to the March 22 hearing, and it could not independently verify that T.H. was in treatment during the March 22 hearing.

The juvenile court denied T.H.'s motion to vacate. The court explained that on March 22 it had issued only a default order in an "abundance of fairness," but based on the record before it, the court was not persuaded that vacating the default termination judgment was appropriate. Report of Proceedings (Dec. 19, 2019) at 14 (Motion). The order denying T.H.'s motion, states, "[T]he court having considered argument from parties finds no procedural due process violation [and] no basis for vacating default termination therefore denies Father's motion for vacating default termination." CP at 98.

T.H. appeals the order denying his motion to vacate the default order and the default termination judgment.

---

[3] *White v. Holm*, 73 Wn.2d 348, 438 P.2d 581 (1968).

ANALYSIS

I. SCOPE OF REVIEW

As an initial matter, T.H.'s notice of appeal cites only the juvenile court order denying his motion to vacate. However, he also seeks direct review of the default order and order terminating his parental rights. He cites to RAP 2.4(b) to argue that his appeal includes a review of all orders and judgments that prejudicially affect the final judgment. He argues, in the alternative, that we should enlarge the time for him to file a notice of appeal of the termination orders because his incarceration and lack of representation constituted "extraordinary circumstances" under RAP 18.8(b). Br. of Appellant at 9. We hold that RAP 2.4 (b) does not allow for review of the underlying orders, and we deny T.H.'s request to enlarge his time to file a notice of appeal. Consequently, we review only the order denying the motion to vacate the default orders.

A.    *RAP 2.4(b) Does Not Allow Review of Underlying Orders*

RAP 5.2(a) generally requires an appellant to file a notice of appeal within 30 days of entry of the decision for review. However, an appellate court may extend that time in some circumstances. RAP 18.8(b). And RAP 2.4(b) allows exceptions to the general rule that appellate courts review only the orders designated in the notice of appeal. RAP 2.4(b) states in relevant part:

> The appellate court will review a trial court order or ruling not designated in the notice, including an appealable order, if (1) the order or ruling prejudicially affects the decision designated in the notice, and (2) the order is entered, or the ruling is made, before the appellate court accepts review.

However, "[a]n appeal from the denial of a CR 60(b) motion is not a substitute for an appeal, and is limited to the propriety of the denial [of the CR 60(b) motion], not the impropriety of the underlying judgment." *In re Dependency of J.M.R.*, 160 Wn. App. 929, 938 n.4, 249 P.3d 193 (2011) (citing *Bjurstrom v. Campbell*, 27 Wn. App. 449, 450-51, 618 P.2d 533 (1980)).

Here, RAP 2.4(b)(1) does not enlarge the time to appeal from that judgment. T.H. did not file an appeal of either the default order or the order terminating his parental rights. To challenge the underlying order of default and default judgment terminating his parental rights, T.H. was required to file a timely appeal, which he did not do. Thus, his argument that his appeal includes a review of the underlying orders fails.

B.      *No Extension of Time for Appeal*

Under RAP 18.8 (b), we may extend time to file an appeal in "extraordinary circumstances" and to "prevent a gross miscarriage of justice." This test is applied rigorously to protect the finality of decisions. *State v. Moon*, 130 Wn. App. 256, 260, 122 P.3d 192 (2005); *Beckman v. Dep't of Soc. & Health Servs.*, 102 Wn. App. 687, 693, 11 P.3d 313 (2000). There are few instances in which we have found this test was satisfied. *Moon*, 130 Wn. App. at 260. The burden to provide sufficient excuse for his failure to file a timely notice of appeal and to demonstrate sound reasons to overcome the judicial preference for finality is on the appellant. *Moon*, 130 Wn. App. at 260. Negligence, or lack of reasonable diligence, does not amount to extraordinary circumstances. *Beckman*, 102 Wn. App. at 695.

For example, in *Scannell v. State*, our Supreme Court held that the petitioner's confusion over a recent change in the appellate rules, his reasonable diligence in carefully following the

11

prior rules, and his good faith attempt to timely file his notice of appeal warranted leniency. 128 Wn.2d 829, 834-35, 912 P.2d 489 (1996). And extraordinary circumstances include instances where the filing, despite reasonable diligence, was defective due to excusable error or circumstances beyond the party's control. *Shumway v. Payne*, 136 Wn.2d 383, 394-97, 964 P.2d 349 (1998).

Here, T.H. has filed neither a notice of appeal concerning the default order and the default judgment, nor a motion to extend the time to file such an appeal. Moreover, T.H. does not claim that despite reasonable diligence, he suffered confusion about the method of seeking review, committed excusable error in interpreting the rules, or that he made an excusable mistake. He does not claim that he attempted in good faith to secure review. Instead, he argues only that his incarceration "prevented [him] from appealing the termination orders" because he was incarcerated and was not represented by counsel. Br. of Appellant at 9. This argument is supported only by T.H.'s statement that also concedes that "some stuff is hard to remember due to my drug use." CP at 81. We note that T.H.'s arrest warrant was issued for his noncompliance with probation and that T.H. was charged with new crimes. T.H. was arrested based on his own actions, and we disagree that his incarceration alone constitutes extraordinary circumstances.

Moreover, the record on appeal offers little in the way of T.H.'s reasonable diligence in filing an appeal or whether filing an appeal was beyond his control because he was incarcerated. T.H.'s declaration is the sole source of the facts supporting his request. T.H. states that he contacted Wenndorf on the phone on April 23 and told him that he wanted to start an appeal. According to T.H., Wenndorf told T.H. that he would look into the appeal process and get back

to him. There are no other details of this phone conversation in the record, which does not appear in Wenndorf's progress report to the juvenile court. T.H. says that he and Wenndorf communicated again about the appeal when Wenndorf met with T.H. in prison just two days before the time to appeal expired. T.H. says that he asked Wenndorf about filing an appeal, and Wenndorf responded that he could not give T.H. legal advice but that T.H. "would need to hurry." CP at 44.

Although T.H.'s declaration shows T.H. expressed an interest to Wenndorf in filing an appeal, those communications do not constitute reasonable diligence. Wenndorf, who was not T.H.'s counsel, disclaimed offering any legal advice, but even counsel's failure to exercise reasonable diligence on a client's behalf does not normally amount to extraordinary circumstances sufficient to justify an extension. *Beckman*, 102 Wn. App. at 695.

Additionally, T.H. has failed to demonstrate a gross miscarriage of justice. As described more fully below, T.H.'s failure to appear at the March 22nd hearing was never explained to the juvenile court's satisfaction. Our record on appeal shows that T.H. never provided corroborating evidence that he was in treatment during any critical period, despite the Department's best efforts to substantiate his conflicting claims. And although T.H. failed to appear at the termination hearing, the State proved all the required statutory factors, including that T.H. had failed to maintain a meaningful role in the children's lives, and that he had not remedied any of his parental deficiencies that included substance abuse, mental health issues, domestic violence victimization, lack of stability, limited parenting skills, lack of understanding his children's needs, and long-term and frequent incarceration. We deny T.H.'s request for an extension to

appeal under RAP 18.8. Accordingly, we do not consider the direct challenge of the order of default or the default termination order, but review only the juvenile court's denial of the motion to vacate the order of default and the default judgment termination.[4]

## II. MOTION TO VACATE

T.H. argues that the juvenile court abused its discretion in denying his motion to vacate because the court applied the wrong legal standard and because the enforcement of the default termination judgment would be inequitable. We disagree.

A.    *Legal Principles*

The Superior Court Civil Rules provide one standard for setting aside orders of default and another standard for setting aside default judgments. CR 55(c)(1); CR 60(b). We review a trial court's ruling on a motion to set aside either a default order or a default judgment for an abuse of discretion. *Estate of Stevens*, 94 Wn. App. 20, 29, 971 P.2d 58 (1999). A trial court abuses its discretion "when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons." *Fowler v. Johnson*, 167 Wn. App. 596, 604, 273 P.3d 1042 (2012). "A proceeding to vacate a default judgment is equitable in character and relief is to be afforded in accordance with equitable principles." *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 581, 599 P.2d 1289 (1978).

Our analysis for setting aside a default *judgment*, as discussed in *White v. Holm*, 73 Wn.2d 348, 352, 438 P.2d 581 (1968), is well established:

---

[4] Because we do not directly review the default termination judgment, we do not consider T.H.'s argument that the juvenile court did not adequately consider the termination factors.

> A party moving to vacate a default judgment must be prepared to show (1) that there is substantial evidence supporting a prima facie defense; (2) that the failure to timely appear and answer was due to mistake, inadvertence, surprise, or excusable neglect; (3) that the defendant acted with due diligence after notice of the default judgment; and (4) that the plaintiff will not suffer a substantial hardship if the default judgment is vacated.

*Little v. King*, 160 Wn.2d 696, 703-04, 161 P.3d 345 (2007); *see also VanderStoep v. Guthrie*, 200 Wn. App. 507, 517, 402 P.3d 883 (2017).

However, the test for setting aside a default *order* is less clear than that of a default judgment. The general rule is that "[t]o establish good cause under CR 55, a party may demonstrate excusable neglect and due diligence." *Estate of Stevens*, 94 Wn. App. at 30. Excusable neglect, though not always required, often will be a key factor for a trial court's determination that good cause exists to vacate a default order under CR 55(c)(1). *Sellers v. Longview Orthopedic Associates, PLLC*, 11 Wn. App. 2d 515, 525, 455 P.3d 166 (2019), *review denied* 195 Wn.2d 1017 (2020).

"CR 55 governs entry of default and entry of default judgment. Under the forerunner of CR 55, once a defendant has been properly adjudged to be in default, the defendant 'cannot contest the subsequent proceedings and is not entitled to further notice thereof.'" *C. Rhyne & Associates v. Swanson*, 41 Wn. App. 323, 325-26, 704 P.2d 164 (1985) (citation omitted) (quoting *Pedersen v. Klinkert*, 56 Wn.2d 313, 320, 352 P.2d 1025 (1960)).

We also recognize that children have a right to establish a "strong, stable, safe, and permanent home in a timely manner," and this right "'cannot be put on hold interminably because a parent is absent from the courtroom.'" *In re Dependency of A.G.*, 93 Wn. App. 268, 279-80, 968 P.2d 424 (1998) (quoting *In re Dependency of C.R.B.*, 62 Wn. App. 608, 616, 814

15

P.2d 1197 (1991)). "The State has an interest in protecting the rights of children, which includes a speedy resolution of termination proceedings." *In re Welfare of S.I.*, 184 Wn. App. 531, 541, 337 P.3d 1114 (2014).

We review alleged violations of due process de novo. *In re Welfare of D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020). Due process in the termination of parental rights context requires that parents have notice, an opportunity to be heard and defend, and the right to be represented by counsel. *In re Welfare of L.R.*, 180 Wn. App. 717, 723, 324 P.3d 737 (2014). Washington parents have a right to be represented at a termination hearing at public expense. *In re Welfare of Luscier*, 84 Wn.2d 135, 139, 524 P.2d 906 (1974), *overruled on other grounds by Lassiter v. Dep't of Social Services*, 452 U.S. 18, 32-34, 101 S. Ct. 2153, 68 L. Ed. 640 (1981); RCW 13.34.090(1).[5]

1. *March 22 Hearing—Default Order*

As an initial matter, we note that neither party clearly distinguishes the differing considerations we must give to the March 22 default *order* and the April 19 default termination *judgment*. The default order at the March 22 hearing determined that T.H. was in default for a failure to appear, having been timely and adequately served with process. After entering the default order, the juvenile court then set another hearing date to consider termination of T.H.'s parental rights. It then entered a default termination judgment on April 19.

---

[5] RCW 13.34.090(1) provides: "Any party has a right to be represented by an attorney in all proceedings [for dependency and termination], to introduce evidence, to be heard in his or her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing, and to an unbiased fact finder."

T.H.'s appeal focuses on the default termination judgment and the juvenile court's refusal to vacate that judgment. T.H. does not argue that the March 22 default order violated his due process. Conversely, the Department appears to focus its arguments on the default order.

T.H.'s motion to vacate sought relief under CR 55 and CR 60. As explained above, the requirements for setting aside a default order and a default judgment are not entirely the same, but they both contain two overlapping elements: excusable neglect and due diligence. Regarding the March 22 order, the record provides reasonable grounds for the juvenile court to find that T.H. did not act with excusable neglect and due diligence. In his declaration, T.H. states that he was in treatment on March 22, but this assertion was never corroborated, despite several efforts on the part of the Department to do so. Moreover, when Wenndorf tried to verify T.H.'s whereabouts, he was told by a supervisor at ABHS that "at no time would a patient be allowed access to a personal cell phone for texting or emailing." CP at 67. Without corroboration, and with the information Wenndorf provided to the court, it was not manifestly unreasonable for the juvenile court to disbelieve T.H.'s statements, and to deem his absence inexcusable.

T.H. also fails to show due diligence. It took T.H. several months before he filed a motion to vacate the orders, and even then, he failed to provide any corroborating evidence that he was at inpatient treatment. After his entry of default but before he was arrested, T.H. did not contact the Department to get an attorney. The record is devoid of a showing of sufficient due diligence to allow for the March 22 order to be vacated. Thus, we hold that the juvenile court did not abuse its discretion when it denied T.H.'s motion to vacate the March 22 order of default.

2. *April 19 Hearing—Default Termination Judgment*

T.H. argues that the juvenile court abused its discretion in denying his motion to vacate because the court applied the wrong legal standard, and because the default termination judgment was inequitable. We disagree.

a. *Correct Legal Standard Utilized*

T.H. argues that the juvenile court applied the wrong legal standard when it denied his motion to vacate, which amounts to an abuse of discretion. Specifically, T.H. argues that the juvenile court abused its discretion by failing to consider the *White* factors in ruling on his motion. We disagree.

A decision is based on untenable grounds or made for untenable reasons if it was reached by applying an incorrect legal standard. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). As mentioned above, a trial court must apply the criteria from *White* when it decides a motion to vacate default judgment. *White*, 73 Wn.2d at 352.

Here, when reviewing both the report of the proceedings and the language of the order denying the motion to vacate, it appears that the juvenile court did apply the *White* factors. In T.H.'s motion, he cited to *White*, listed the factors, and argued that he met the *White* factors. In making its decision, the juvenile court based its decision on the record before it, and stated that it was not persuaded that vacating the default termination was appropriate. The order denying T.H.'s motion states, "[T]he court having considered argument from parties finds no procedural due process violation and no basis for vacating default termination therefore denies father's motion for vacating default termination." CP at 98.

18

Although the juvenile court did not consider each *White* factor on the record, we are not convinced that the court applied an incorrect legal standard. Thus T.H.'s argument that the juvenile court abused its discretion for failing to consider the *White* factors fails.

b. *T.H. Cannot Meet the* White *Factors*

T.H. argues that he met the *White* factors in this case, thus, the juvenile court abused its discretion. We disagree.

A movant seeking to vacate a judgment must support their motion by affidavit. CR 60(e)(1). The affidavit must set forth a concise statement of the facts or errors upon which the motion is based, including the facts constituting a defense to the action or proceeding. CR 60(e)(1). We consider the evidence and all reasonable inferences drawn therefrom in a light most favorable to the movant. *Pfaff v. State Farm Mutual Auto. Ins. Co.*, 103 Wn. App. 829, 835, 14 P.3d 837 (2000).

When the Department establishes the statutory elements of RCW 13.34.180(1)(a)-(f) by clear, cogent, and convincing evidence, then a trial court may terminate parental rights. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016); RCW 13.34.190(1)(a)(i). Those elements are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

Here, the State provided evidence to support all the statutory elements to terminate T.H.'s parental rights. And T.H. failed to present sufficient evidence of a defense. T.H.'s only claim regarding his defense, was "the facts as to his success or failure in drug treatment were and are developing." CP at 61. Not only is this a failure of proof that he has remediated a parental deficiency, substance abuse was only one of several parental deficiencies raised by the Department. T.H. failed to present a defense.

Turning to excusable neglect, T.H. argues that he was in treatment when he missed the March 22 hearing, and incarcerated during the April 19 hearing. Although we consider the evidence and all reasonable inferences drawn therefrom in a light most favorable to T.H., we note that the Department gave T.H. multiple opportunities to corroborate this evidence, which he failed or refused to do. Even after he first noted his motion to vacate, the Department offered to recommend that the order be vacated upon T.H. corroborating his bald statement that he was in treatment. And although the juvenile court set the hearing over for three months, TH still failed to provide this proof. He repeatedly failed to give the court or the Department credible proof that he was in treatment on March 22nd.

Considering hardship to the parties, we recognize a parent's constitutional rights to parent their children. However, there also exists "a strong interest not only in establishing a stable and permanent home for the child, but also in doing so as soon as possible." *In re Dependency of*

*C.R.B.*, 62 Wn. App. at 615.  The State has an interest in a speedy resolution of termination

proceedings, which protects the interests of the children.  *In re Dependency of M.S.*, 98 Wn. App.

91, 95, 988 P.2d 488 (1999).  A delay in termination proceedings would only have resulted in

further delay in B.H. and G.H. finding a stable and permanent home.

Even assuming T.H.'s declaration shows due diligence, this factor alone would not

warrant reversal.  A consideration of all the *White* factors convinces us that the juvenile court did

not abuse its discretion when it denied T.H.'s motion to vacate the default order and the default

termination judgment.

c. *Due Process Not Violated*

T.H. argues that the juvenile court abused its discretion in denying his motion to vacate

the default termination judgment because the Department and juvenile court violated his due

process rights rendering enforcement of the default termination inequitable.  T.H.'s brief focuses

on the April 19 hearing and argues that T.H.'s due process rights were violated when he was not

given an opportunity to appear and defend despite his efforts.  T.H. also argues that it is

significant that the Department knew he was incarcerated, but omitted this fact in testimony

before the tribunal.  The Department argues that T.H. was afforded sufficient procedural due

process rights of notice and opportunity to be heard, and that because T.H. failed to appear at the

March 22 hearing when a default order was entered, he was not entitled to contest the subsequent

proceedings or be present at the April 19 hearing.  We agree with the Department.

Parents are entitled to procedural due process protections of notice and opportunity for a hearing appropriate to the nature of the case. *In re Dependency of C.R.B.*, 62 Wn. App. at 614. We balance three factors when examining the adequacy of process: "(1) the private interest at stake, (2) the risk that the procedure used will result in error, and (3) the State's interest in retaining the procedure used and the fiscal or administrative burden if additional safeguards were provided." *In re Welfare of S.I.*, 184 Wn. App. 531, 541, 337 P.3d 1114, 1117-18 (2014).

Viewing the private interest at stake, the parent, child, and the State's interest compete in a termination proceeding. A parent has a protected interest in the care and custody of his child; children have a right to establish a safe, stable and permanent home in a timely manner; and the state has an interest in protecting the rights of the children. *Id* at 541-43. We balance such that the rights and safety of the child should prevail over the legal rights of the parent. RCW 13.34.020.[6]

Considering the risk that the procedure used will result in error, we note that the State is not precluded from obtaining a termination judgment by default when a parent fails to respond to a notice and summons. *C.R.B.*, 62 Wn. App. at 616. The juvenile court here held a meaningful hearing on the merits of the case, which satisfies due process. *Id*. The procedure used decreased the risk of error by ensuring that the juvenile court's decision was based on the merits of the case while balancing the rights of the parent, child, and the State. *See In re Dependency of E.P.*, 136

---

[6] RCW 13.34.020 provides that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail."

Wn. App. 401, 407, 149 P.3d 440 (2006). This procedure minimized the risk that T.H.'s rights were terminated in error.

Considering the State's interest in retaining the procedure used and the fiscal or administrative burden if additional safeguards were provided, we note that RCW 13.34.180 requires the State to prove a multitude of elements including offering T.H. reasonable and necessary services that would lead to his reunification with his children. RCW 13.34.180(1)(a)-(f). The Department proved every element.

T.H. argued below that his due process rights were violated because the Department did not notify the court that T.H. was in custody, and that it was the local practice of the juvenile court to appoint counsel for all parents in custody and to continue the hearing to allow the parent to participate. But by the time T.H. was taken into custody, a default order had already been entered. And once a defendant had been adjudged to be in default, he "'cannot contest the subsequent proceedings.'" *Swanson*, 41 Wn. App. at 325-26 (quoting *Pedersen*, 56 Wn.2d at 320.

T.H.'s argument that his due process rights were not violated fails.

## III. CONCLUSION

In conclusion, we do not directly review the order of default or the default termination order. We hold that the juvenile court did not abuse its discretion when it denied T.H.'s motion to vacate these orders. Moreover, T.H's due process rights were not violated.

No. 54304-4-II
Cons. No. 54314-1-II

    We affirm.

    A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, P.J.

We concur:

_____
Melnick, J.P.T.

_____
Cruser, J.