IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>A.J.C. and L.C.,<br><br>Minor children. | No. 82521-6-I<br>(consolidated with No. 82522-4-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — In 2017, the Department of Children, Youth & Families removed A.J.C. and L.C. from their mother Z.B.'s care. A court entered a dependency order, which required Z.B. to participate in mental health counseling and a parenting program and provided for regular visits with her children. After Z.B.'s ongoing lack of engagement with services and visits, the Department petitioned for termination of parental rights in September 2018. The parties participated in a settlement conference in 2019 in which the parties agreed to continue the trial so that Z.B. could demonstrate engagement in services and visits. The case proceeded to trial during which, over Z.B.'s objections, the court admitted evidence referring to the settlement conference. The court terminated Z.B.'s parental rights. Z.B. appeals. For the reasons discussed below, we affirm.

I. BACKGROUND

In March 2017, Z.B. called Child Protective Services (CPS) and said she could no longer care for her children A.J.C. and L.C.[1] because she was

---

[1] The father is not a party to this case.

Citations and pin cites are based on the Westlaw online version of the cited material.

overwhelmed.  She later explained this was in part because of domestic violence by the children's father.  A social worker came to Z.B.'s home but did not remove the children because she did not see an immediate risk of harm.  The same evening, Z.B. called law enforcement and had them take the children to her mother's home where the Department took them into its custody.

On June 30, 2017, the King County Juvenile Court entered an Order of Dependency to which Z.B. agreed.  The Order allowed Z.B. to visit her children twice a week for two hours per visit.  It also required Z.B. to undergo mental health assessment and treatment and participate in a parenting program called STRIVE.  Z.B. satisfactorily completed those requirements and the children returned to her care in November 2017.  Also in November, the Department referred Z.B. to mental health counseling but the counselor dropped the referral due to Z.B.'s lack of engagement.  After the children returned to Z.B.'s care, she stopped communicating with the Department and stopped participating in services.

The Department removed the children from Z.B.'s care in December 2017, after she placed them with her mother, because her mother had a history of CPS involvement.  After the children's removal, Z.B. had "minimal contact" with the Department for about four months.  And Z.B.'s visits were "minimal and inconsistent."

In early 2018, social worker Abbie Tauvell referred Z.B. to mental health counseling.  Z.B. initially engaged with the counseling but stopped during the summer of 2018.  In the fall of 2018, Z.B. requested a new referral for

counseling, but did not begin counseling once the referral was entered. Tauvell testified that while she was on the case, at times Z.B. would not respond to her email, phone, and text communications for weeks or months and Z.B. confirmed this to be the case.

On September 6, 2018, the Department petitioned for termination of Z.B.'s parental rights. On September 11, Z.B. emailed Tauvell requesting counseling and visits. She had regular visits for about three weeks. Z.B. also started counseling in the spring of 2019 but had only eight sessions in over a year despite a plan to meet every other week. In September 2019, Geneva Curry began as the social worker on Z.B.'s case.

In October 2019, Z.B. and the Department attended a settlement conference. At the conference, the parties agreed to continue the trial date so that Z.B. could demonstrate engagement with counseling, a parenting program, and visitation. Following the conference, Z.B. participated in regular weekly counseling for some time. Z.B. also regularly visited her children. And Z.B. began participating in a parenting program called Triple P. But in November 2019, Z.B. stopped attending visits and fell out of contact with Curry. She also stopped participating in Triple P after three sessions.

In January 2020, Z.B. reached out to Curry and requested to schedule a visit but the visit was cancelled due to Z.B.'s failure to confirm. Z.B. once again stopped responding to Curry's communications. In April, Z.B. responded to Curry and requested services. Curry again referred Z.B. to Triple P. But Triple P dropped the referral after one session due to Z.B.'s lack of contact and

3

engagement. In May, Z.B. re-engaged with counseling and had a few sessions before stopping again. In November, Z.B. again requested services and visits. She started Triple P for a third time and completed the classroom portion of the program. But she did not visit her children, so she could not practice the skills she learned, which was a required part of the program. She expressed concern to Triple P about restarting visits because she was not sure how her children would receive her after her absence from their lives.

In January 2021, Z.B. again requested visits, which Curry scheduled. But Z.B. again failed to confirm so the visits were cancelled.

Trial commenced in February 2021. A.J.C. was seven years old at the time of trial and L.C. was four years old. The children had been living in licensed care for over three and a half years. The children's guardian ad litem (GAL) testified that she did not believe either child had a strong bond with Z.B. at that point and that she believed termination was in the best interest of the children.

During trial, Z.B. repeatedly objected to any mention of the settlement conference. The mentions fell into two categories, testimony by people who had attended the conference and service letters from Curry following the conference. The court overruled the objections and noted that it would not consider the evidence for an improper purpose under ER 408. The trial court ordered termination of Z.B.'s parental rights.

Z.B. appeals.

## II. ANALYSIS

Z.B. contends that the trial court erred by admitting evidence relating to

4

the settlement conference in violation of ER 408. We conclude that the trial court acted within its discretion by admitting the contested evidence, and even if it had not, any error would be harmless.

We review a trial court's decision to exclude evidence under ER 408 for abuse of discretion. Klotz v. Dehkhoda, 134 Wn. App. 261, 271, 141 P.3d 67 (2006). A court abuses its discretion when its decision "is manifestly unreasonable or based on untenable grounds or reasons." Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668–69, 230 P.3d 583 (2010) (quoting State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)).

ER 408 provides in pertinent part,

In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability. . . . Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . . . This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

In sum, the rule "excludes evidence of conduct or statements made in settlement negotiations to prove liability," but courts may admit such evidence for other purposes. Klotz, 134 Wn. App. at 271.

"ER 408 was enacted to protect parties and witnesses from the potentially corrosive effect settlement evidence may have on a jury." Northington v. Sivo, 102 Wn. App. 545, 550, 8 P.3d 1067 (2000). Yet "in the context of 'a bench trial, there is even a more liberal practice in the admission of evidence on the theory

that the court will disregard inadmissible matters.'" Bill & Melinda Gates Found. v. Pierce, 15 Wn. App. 2d 419, 445, 475 P.3d 1011 (2020) (internal quotation marks omitted) (quoting State v. Jenkins, 53 Wn. App. 228, 231, 766 P.2d 499 (1989)), review denied, 197 Wn.2d 1006, 483 P.3d 785 (2021) ; see also State v. Gower, 179 Wn.2d 851, 855, 321 P.3d 1178 (2014) (There is "a presumption on appeal that the trial judge, knowing the applicable rules of evidence, will not consider matters which are inadmissible when making [their] findings." (internal quotation marks omitted) (quoting State v. Miles, 77 Wn.2d 593, 601, 464 P.2d 723 (1970)).

To grant a petition for termination of parental rights in a dependency case, the trial court must find the following, among other requirements, proven by clear, cogent, and convincing evidence:

> (d) That the services ordered . . . have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

RCW 13.34.180(1); Matter of K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016) ("The State must prove these allegations by clear, cogent, and convincing evidence."). In assessing prong (e), the court may consider the

6

[f]ailure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure."

RCW 13.34.180(1)(e)(iii).

During Z.B.'s testimony, the GAL's counsel asked her whether she remembered "coming up with a plan to have more contact with [her] kids." Z.B.'s counsel objected, saying that it involved communications from the settlement conference. The court allowed Z.B. to answer the question, stating that it did not "want [Z.B.] talking about what they were specifically doing to try to settle the case, to the extent that they were developing a plan that had to do with her having contact with her kids . . . that is appropriate for her to be able to testify about."

During Curry's testimony, the Department's counsel asked her, "What was your understanding of what was agreed at the settlement conference?" Z.B.'s counsel objected. The court allowed the testimony stating, "Obviously there shouldn't be any discussion of the negotiations. . . . But it does make sense, in terms of evaluating the services being provided by the Department, to understand what Ms. Curry's understanding was." Curry then testified that her understanding was that there would be weekly meetings, Z.B. would participate in counseling and Triple P, and they would re-establish visitation.[2]

---

[2] Z.B. also cites other mentions of the settlement conference during the trial in her briefing, but we do not address the mentions to which she did not object below. See City of Seattle v. Long, 198 Wn.2d 136, 155, 493 P.3d 94 (2021) ("Generally a party waives the right to raise an issue on appeal that was not raised before the trial court."); RAP 2.5(a).

Also during Curry's testimony, the Department sought to introduce seven service letters Curry sent to Z.B. after the settlement conference. All of the service letters included this language: "Since the settlement conference agreement to extend your case 90 days, the following has been agreed upon." Z.B. objected to the introduction of Exhibits 62–67 on ER 408 grounds. The court admitted all of the service letters, noting that admission was proper for the purpose of recording the ongoing communications between Curry and Z.B. and stating that it would "disregard . . . anything that has to do with the actual settlement negotiations, as opposed to what Ms. Curry's understanding was of the agreement going forward that therefore shapes the services that were being offered by the Department."[3]

The court did not abuse its discretion by admitting Z.B. and Curry's testimony relating to the settlement conference. Z.B.'s negative answer to the question of whether she remembered coming up with a plan to have more contact with her children was not "[e]vidence of conduct or statements made in compromise negotiations" admitted to prove liability. ER 408. Nor was Curry's testimony about her understanding of what services the Department was to offer Z.B. following the conference "[e]vidence of conduct or statements made in compromise negotiations" admitted to prove liability. ER 408. The testimony was admitted for the purpose of explaining what services the Department was offering to Z.B.

_____

[3] Z.B. also objects to the admission of an email from Curry to Z.B. about Triple P on ER 408 grounds. But the email does not reference the settlement conference.

The court also did not abuse its discretion by admitting the service letters that mentioned the settlement conference. The Department introduced the letters to show the Department's continued efforts to communicate with Z.B. about the services it was offering to her. The court stated it would not consider any evidence related to the actual conference; it could still consider the letters for the purpose the Department introduced them. And courts are presumed to disregard inadmissible evidence. See Gates Found., 15 Wn. App. 2d at 445.

"We do not reverse a verdict based on an evidentiary error unless the error was prejudicial." Diaz v. State, 175 Wn.2d 457, 472, 285 P.3d 873 (2012). "An error is not prejudicial unless it affects, or presumptively affects, the outcome of the trial." Id. Even without the service letters in Exhibits 62–67 and the limited testimony about the settlement conference, the remaining evidence still supports the court's ruling. The evidence demonstrated a pattern of lack of engagement with services and a failure to regularly visit the children. Given the totality of other evidence in this case, we cannot say any error in admitting or considering settlement conference affected or presumptively affected the outcome of the trial. Id.

We affirm.

_____
Chun, J.

WE CONCUR:

_____          _____
Smith, J.                                                    Dwyer, J.

9