# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Parental Rights to<br><br>H.S.W. | DIVISION ONE<br><br>No. 85625-1-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — K.W. appeals the trial court's order terminating his parental rights to his daughter, H.S.W. He asserts that the Department of Children, Youth, and Families (the Department) failed to prove by clear, cogent, and convincing evidence that he has parental deficiencies that cannot be remedied in the child's near future. K.W. also challenges the trial court's findings that he is currently unfit to parent and that termination of his parental rights is in H.S.W.'s best interests. We affirm.

I

H.S.W. was born on March 25, 2020 to mother S.K. and father K.W. At that time, the Department received an intake communication concerning H.S.W. wherein the mother's lack of prenatal care and history of significant mental health issues, as well as her use of crack cocaine and methamphetamines during the pregnancy, were detailed. During the initial meeting with the Department, H.S.W.

showed signs of withdrawal including tremors and sleep disturbances.  K.W. did not visit H.S.W. while she was in the hospital.

On March 31, 2020, the Department filed a petition for dependency as to both parents and requested shelter care.  As to the mother, the Department alleged that she had a history of substance use and mental health challenges that included psychosis, auditory hallucinations, and recent suicidal ideations.  As to K.W., the Department noted concerns that he had a 2019 civil domestic violence protection order against him and a history of criminal charges that included drug, kidnapping, assault, and weapon offenses.  The dependency petition also reported that K.W. had minimized the mother's mental health and chemical dependency issues, as well as her need for prenatal care.  The court entered an order of dependency and H.S.W. was removed from her parents' care.

Both parents waived the 72-hour shelter care hearing and agreed to H.S.W.'s placement with a relative.  In the shelter care proceeding, the Department recommended, and the trial court ordered, that K.W. cooperate with establishing paternity, complete assessments for domestic violence, parenting, mental health, and chemical dependency, and follow the recommendations resulting from these assessments.  The Department also recommended that K.W. complete 90 days of random urinalysis testing (UA) after he established chemical dependency services.

K.W. contested the dependency, but did not appear at the hearing and was not represented by counsel.  The court entered an order of dependency as

to him on June 8, 2020.  The court ordered K.W. to establish paternity as well as engage in (1) domestic violence batterer's treatment and follow treatment recommendations, (2) drug and alcohol evaluation and follow treatment recommendations, (3) random UAs once per week for 90 days with the Department permitted to request additional random UAs up to six times per month upon suspicion of substance use, (4) parenting assessment and follow recommendations, (5) mental health assessment and follow recommendations, (6) age appropriate evidence-based parenting program, and (7) in-home services upon reunification.  The mother agreed to an order of dependency on August 31, 2020.

At an August 2020 dependency review hearing, the trial court found that K.W. was not in compliance with the court order and had not made progress toward correcting the problems that had led to the need for out-of-home care for H.S.W.  Additionally, the trial court noted that K.W. had not visited H.S.W.

In February 2021, Anastasia Mudraya was assigned as the social worker on the case.  She served in that role until September 2021.  During that time, K.W. had minimal involvement in the case.  At a permanency planning hearing on March 5, 2021, the trial court found that K.W. had not visited regularly, was not in compliance with the court order, and had not made progress toward correcting the problems that necessitated H.S.W.'s placement in out-of-home care.  K.W. later visited H.S.W. once, on June 11, 2021, but he did not attend any subsequently arranged visits.  Court orders from October 2021 and February

3

2022 reported that K.W. had shown no engagement in the case and had not made progress regarding the services ordered.

In September 2021, social worker Chazlyn Zablan began working with the family. Starting in November 2021, K.W. attended twice weekly supervised visits with H.W and had completed 12 visits as of February 2022. According to Zablan, the "[v]isits have been going great," with K.W. learning and attending to H.S.W.'s needs and the two engaging in positive interactions with each other. As for services, Zablan provided K.W. with referrals for a domestic violence evaluation and a parenting assessment in February 2022.

On May 12, 2022, the Department filed a petition to terminate the parental rights of both K.W. and the mother. The Department alleged the parental deficiencies that impair K.W.'s ability to safely parent H.S.W. as: (1) a significant history of substance abuse, (2) untreated substance use that resulted in ongoing risk of child neglect, (3) an ongoing risk of harm due to mental health issues, (4) a lack of understanding of the child's developmental needs, (5) inadequate parenting skills to provide for H.S.W.'s needs, (6) a history of domestic violence and a demonstrated inability to provide a home environment free from exposure to domestic violence, and (7) a demonstrated lack of commitment to parenting responsibilities by failing to finalize paternity and enter a parentage order. The Department stated that it had repeatedly made efforts to offer services and referrals to the parents. As to K.W.'s engagement, the Department explained:

> Although the father began to consistently participate in
> visitation, he has not made significant progress towards correcting
> the problems that necessitated the removal of the child. Though

4

genetic testing identifies [K.W.] to be the child's biological father, the father has not entered a parentage order in order to finalize paternity. The father did not participate in a drug and alcohol evaluation nor has he completed 90 days of consistent clean UAs and his substance abuse issues remain untreated. The father has not followed through with his other court ordered services and evaluations for a [domestic violence] assessment; mental health assessment; parenting assessment; and he has not participated in an age appropriate evidence-based parenting program.

In addition, the petition for termination stated that, in the nearly two years since the entry of the disposition order, both parents had failed to substantially improve their deficiencies.

While the termination trial was pending, the Department continued to offer services to K.W. K.W. and H.S.W. had consistent and positive supervised visits, three days per week for two hours each, although Zablan noted that no visits occurred between February and mid-April "due to unknown whereabouts of [K.W.]." In June 2022, Zablan provided K.W. with a second referral for a domestic violence evaluation. That month, K.W. failed to attend three scheduled UAs. In July 2022, Zablan provided K.W. with a referral for a drug and alcohol assessment.

On July 29, 2022, K.W. attended a chemical dependency evaluation. A UA performed at the time of the assessment tested positive for cannabis and alcohol. K.W. self-reported that he had consumed six glasses of beer that day. He also reported that three times per week he smoked between one to three blunts of cannabis with a recent consumption of three blunts on July 24. Pursuant to the evaluation, K.W. was diagnosed with both mild alcohol use disorder and mild cannabis use disorder. The recommended treatment plan

consisted of six months of outpatient treatment and six months of follow up treatment.

Following a dependency review hearing on September 1, 2022, the trial court found that K.W. had made partial progress toward correcting the problems necessitating out-of-home care. The social worker reported that, beginning mid-April 2022, K.W. had visited regularly with H.S.W. and that the visits had been positive. At that time, the court granted K.W. three three-hour unsupervised visits per week. The court ordered the Department to make "active efforts" to assist K.W. in obtaining services. The court further stated that it would consider allowing overnight visits if K.W. engaged in substance use disorder treatment and UAs.

On September 29, 2022, K.W. attended an intake appointment for substance use disorder treatment as well as his first treatment session. However, at the follow-up dependency review hearing on October 13, the court did not order overnight visits because K.W. had completed only one UA. The court informed the parties that "[f]ather's counsel may bring a motion to begin overnight visits upon 30 days of consecutive, no missed, clean UAs."

On October 19, K.W. produced a UA that tested positive for both cannabis and alcohol. As a result, he was placed in intensive outpatient substance use treatment for two months. On January 5, 2023, K.W. was discharged from the substance use treatment program due to noncompliance with attendance and program rules.

In December 2022, K.W. underwent a domestic violence evaluation. As part of the evaluation, the provider considered that K.W. had a history of two separate orders of protection involving previous partners. His former girlfriend, Ebonee Heller, had obtained a protection order against him in 2019. Then, in May 2021, K.W. petitioned for and received a domestic violence no-contact order protecting him from H.S.W.'s mother. According to the domestic violence evaluator, this history of incidents with two different partners is a high-risk factor, and she, therefore, recommended level 3 domestic violence treatment for 12 months. Additionally, K.W. performed the Domestic Violence Inventory, a standardized assessment, but the testing was invalidated by an "extreme number of deviant Truthfulness Scale answers." According to the domestic violence treatment evaluator, this would indicate that "they were dishonest, or trying to present themselves in an overly favorable light." The result also demonstrated "a lack of accountability."

Despite the existence of the domestic violence no-contact order that K.W. had obtained for protection from H.S.W.'s mother, visit supervisors alerted Zablan that they had seen K.W. transporting the mother to her visits with H.S.W. During the February 28, 2023 permanency planning hearing, the court ordered that the parents follow the no-contact order in place, otherwise, if the parents arrived together, the visit would be supervised. At that time, the court found that K.W. was in partial compliance with its orders, as he had completed both a substance use evaluation and a domestic violence evaluation but was not yet following recommendations from either evaluation.

On March 2, 2023, a Washington State Patrol trooper initiated a traffic stop after radar determined that K.W. was driving at a speed of 88 MPH in a zone with a speed limit of 70 MPH. Immediately upon contact with K.W. the trooper detected a very strong odor of alcohol. K.W. "was difficult to deal with," according to the trooper. K.W. did not have a driver's license and stated that he did not need a license as he was "simply traveling." When K.W. exited the vehicle he stumbled, needed to balance himself with the car, and had watery, bloodshot eyes. The trooper also identified one tetrahydrocannabinol (THC) "dab pen" in the center console of the car and another in K.W.'s pocket. K.W. refused both a field sobriety test and a breath sample. The trooper placed K.W. under arrest for driving under the influence of intoxicants (DUI). As of the termination trial, no charges had been filed in the incident.

In April 2023, K.W.'s counsel arranged for him to undergo a second substance use assessment. At that time, K.W. reported that he did not have a problem with alcohol or drugs. In a UA associated with the assessment he tested positive for alcohol and cannabis. He was diagnosed with moderate alcohol use disorder and moderate cannabis use disorder. The treatment recommendations included intensive outpatient treatment for a minimum of 36 group therapy sessions over the course of three months, followed by a minimum of 24 group therapy sessions of relapse prevention over the course of three months, and outpatient group therapy for a minimum of 12 sessions over the course of three months. However, the treatment plan was "subject to change

depending upon [K.W.'s] individual progress. Should [K.W.] be unable to abstain, a higher level of care may be recommended."

After several continuances, the termination trial, initially set for September 2022, occurred at the end of May and the beginning of June 2023. Social workers Mudraya and Zablan, the Court Appointed Special Advocate (CASA) for H.S.W., the domestic violence evaluator, and a Washington State Patrol trooper testified as to the above facts on behalf of the Department.

K.W. presented testimony from himself, an evidence-based parenting program instructor, an expert in race and bias in the child welfare system, and an independent child welfare expert. During his testimony, K.W. denied any instances of domestic violence, stating, "I'm a peaceful person." He also admitted that he continued to use alcohol and cannabis to "self-medicate." He maintained that he did not need sober support meetings because "I'm a functional person. I think that's for dysfunctional people. I'm not a dysfunctional person."

The parenting program instructor testified that K.W. had completed the "Incredible Years" evidence-based parenting program. She described K.W. as "a beautiful guy." She testified that K.W. had initially refused to enroll in the class, saying, "I don't need a parenting class. [H.S.W.] is my daughter. I am her biological father. I have a job. I have a house. I am fully capable of parenting my child. It's insulting to me that I have to take this class." She convinced him that he needed to complete the court ordered service so that he could regain custody of his daughter and, accordingly, he "attended every single class, except

when he was in court, and participated magnificently." The instructor testified that K.W. was "a natural" parent.

The expert on race and bias in the child welfare system testified that he had concerns as to whether K.W. was being misperceived or misconstrued and whether he was given ample time to demonstrate both his ability and willingness to parent H.S.W. The expert also explained that repeated allegations against a parent impact the parent's ability to engage in the child welfare system by "bringing up the past." The expert described that from the parent's perspective, "[i]f there were concerns and they weren't founded and people keep bringing them up, then I don't get a chance to show you what I can do, because I'm too busy focused on what other people are concerned about that shouldn't be involved in the concerns at all." He characterized such repeated allegations as "micro aggressions" that suggested that the Department had a bias that K.W. is not a responsible person and "that he's not going to be someone that his kids can count on."

The independent child welfare expert opined that the Department imposed "a cookie cutter" approach on K.W. with the requirement that he complete domestic violence, substance use, mental health, and parenting services. She testified that, in her view, neither a domestic violence nor a substance use evaluation were necessary. She stated, "I believe the service plan that was recommended by the Department does not have anything to do with safety of [H.S.W.] related to [K.W.]. It has to do with allegations. Risk reports in file, but no specific safety threat."

After hearing the testimony and arguments of the parties, the trial court issued its findings of fact in which it found the Department's witnesses to be credible. In contrast, the court found the parenting program instructor and the independent child welfare expert "were not credible witnesses, and did not provide helpful information to the fact-finder." Additionally, K.W.'s "testimony, where self-serving, was not credible." The court found that "the evidence presented at trial was overwhelmingly in favor of termination of parental rights, and the Department more than met its burden." The court entered orders terminating the parental rights as to both parents. K.W. appeals.

II

On appeal, K.W. challenges the trial court's findings of fact and conclusions of law on these issues: (1) whether K.W. is unfit to parent when the record demonstrates that he was able to safely and adequately care for H.S.W. during his nine hours of weekly unsupervised visits, and (2) whether termination is in H.S.W.'s best interests.

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The first step focuses on the adequacy of the parents, and the second step focuses on the child's best interests. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

For the first step of the test, the State must prove six statutory elements by clear, cogent, and convincing evidence. In re Parental Rights to B.P., 186 Wn.2d 292, 312, 376 P.3d 350 (2016). These elements are:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180. Clear, cogent, and convincing evidence exists when the ultimate fact at issue is shown by evidence to be "'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

Once the Department establishes these statutory factors, the trial court must then make a finding of current unfitness before parental rights can be terminated. In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75

(2016). A trial court's finding that the six statutory prerequisites have been met constitutes an implicit finding of unfitness. B.P., 186 Wn.2d at 313. If this burden is satisfied, termination may be ordered if the Department establishes, by a preponderance of the evidence, that it is in the best interests of the child. RCW 13.34.190(1)(b); K.M.M., 186 Wn.2d at 479.

When reviewing a trial court's decision to terminate parental rights, we must determine whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence. K.M.M., 186 Wn.2d at 477. Because of the highly fact-specific nature of termination proceedings, we defer to the trial court's assessment of witness credibility and the persuasiveness of the evidence. K.M.M., 186 Wn.2d at 477. The trial court's findings of fact will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record. K.M.M., 186 Wn.2d at 477. We review de novo whether the court's findings of fact support its conclusions of law. K.M.M., 186 Wn.2d at 477. However, "unchallenged findings of fact are verities on appeal." In re Est. of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

A

K.W. avers that the trial court erred by entering the order terminating his parental rights. This is so, he argues, because the State failed to provide clear, cogent, and convincing evidence that he has parental deficiencies that result in parental unfitness and that cannot be remedied in H.S.W.'s near future. K.W. asserts that his lack of compliance with court ordered substance use disorder treatment and domestic violence treatment does not prove him unfit when he has

13

shown himself able to safely care for H.S.W. during his three three-hour weekly visits with her. These arguments fail.

K.W.'s argument challenges two separate determinations that the trial court must make before terminating a parent's rights. First, RCW 13.34.180(e) requires proof by clear, cogent, and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The focus of this requirement is whether parental deficiencies have been corrected. K.R., 128 Wn.2d at 144. For this inquiry, "[w]hat constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006).

Here, the trial court found that "[t]he uncontested testimony is that [H.S.W.]'s near future is a matter of weeks to maybe two months." K.W. does not assign error to the trial court's finding of fact that H.S.W.'s "near future" is, at most, two months, and he does not argue that this timeline is incorrect. Thus, the finding of fact that H.S.W.'s near future is "a matter of weeks to maybe two months" is unchallenged, and is, therefore, a verity on appeal. Jones, 152 Wn.2d at 8. Accordingly, the State was required to prove, by clear, cogent, and convincing evidence that K.W. has parental deficiencies that cannot be remedied within "a matter of weeks to maybe two months."

Once the Department has established the elements required by RCW 13.34.180, including that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," the court then

considers the nonstatutory prerequisite of parental unfitness, which must be proven by clear, cogent, and convincing evidence. B.P., 186 Wn.2d at 312. "In order to prove unfitness, the [Department] must show that the parent's deficiencies make him or her incapable of providing 'basic nurture, health, or safety.'" B.P., 186 Wn.2d at 313 (internal quotation marks omitted) (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014)). "The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under [the Juvenile Court Act]." RCW 13.34.020.

K.W.'s argument that evidence of substance use and domestic violence does not prove him unfit merges three distinct questions: (1) Does K.W. presently have parental deficiencies? (2) Can the deficiencies be remedied in the near future? (3) Do those deficiencies cause him to be unfit to parent? We examine the issues first with respect to substance abuse and then with respect to domestic violence.

1

First, K.W. avers that his substance use was not a parental deficiency such that he was unfit to parent H.S.W. In so doing, he claims that the Department failed to prove that his "use of legal substances used by many parents was so significant a problem that it justified denying him the opportunity to raise his daughter." Br. of Appellant at 30-31. Further, K.W. challenges the trial court's findings that he has "untreated substance use disorder issues," that he has not engaged in treatment, and he "has knowledge and understanding

about what is necessary for effective substance use disorder treatment but does not believe that it applies to him."

Indeed, the trial court made multiple findings of fact concerning K.W.'s substance use. However, while he assigns error to the trial court's finding that he has an untreated substance use disorder, K.W. fails to assign error to the findings of fact the trial court cited in support, including the two substance use disorder evaluations and recommendations, the positive UA tests, or the facts of the DUI arrest. Further, K.W. fails to challenge findings of fact that specifically address the safety implications of his substance consumption. Among the unchallenged findings, the court detailed that on the day of his first substance use disorder treatment, K.W. admitted to consuming six beers and had a UA positive for alcohol and cannabis. The court found that "the father either did not care or could not help himself, which is very concerning." The court also noted that K.W. had a visit with H.S.W. that same day, stating, "[w]hile this Court is not sure if the father was impaired at the visit with [H.S.W.], it is concerning. At an earlier visit in May 2022, father was reported to have almost dropped [H.S.W.], to have stumbled, and to have had trouble locating his own vehicle after ending the visit with [H.S.W.] early." Additionally, when addressing the DUI arrest, the court noted that "[a]t a minimum, the father's behavior demonstrates extremely poor judgment given his diagnosed substance use disorder issues." These unchallenged findings, now verities on appeal, support with clear, cogent, and convincing evidence, the trial court's determination that K.W. has "untreated substance use issues."

As to whether K.W.'s substance use amounted to a parenting deficiency, the CASA testified about its impact on his ability to parent, stating:

> He appears to have no insight into how significantly he's affected by his substance use. I'm concerned that he appeared twice for a drug alcohol evaluation and each time tested positive for both alcohol and marijuana use. I'm concerned that if he can't appear sober for a drug alcohol evaluation that's going to help determine unification with his child, how is he going to be able to stay sober long enough to take care of her needs, the needs of a toddler 24 hours a day?
> He's presenting as a single parent. There are many tasks and responsibilities throughout the 24 hours of the day. I'm very concerned that he can remain sober long enough to perform those tasks adequately.

Zablan echoed these concerns, stating that K.W.'s substance use is a "behavior [that] negatively impacts child safety," because H.S.W. "is three years old, vulnerable, and needs to make sure that her needs are being met consistently and with [K.W.] not being able to maintain [sobriety] that poses a safety threat as to [H.S.W.]."

K.W. disagrees with this assessment and asserts that his use of substances has not impacted his ability to parent during his successful unsupervised visits with H.S.W nine hours per week. However, the CASA specifically addressed this issue:

> I realize [K.W.] has had unsupervised visits successfully for a number of months. But entertaining a toddler for three hours is much different from caring for that toddler for 24 hours, day after day after day. And so, as mentioned earlier, I am concerned that with untreated substance abuse disorder, of which he is not even aware -- he seems unaware. And with his risk of domestic violence, I am very concerned that he cannot adequately or safely parent [H.S.W.].

This testimony, while acknowledging success with visitation, explained that the visits do not equate to the level of care K.W. would need to provide for H.S.W. and that his untreated substance use disorder would prevent him from providing that care. Thus, the testimony and evidence provide clear, cogent, and convincing evidence to support the trial court's finding that K.W.'s substance use is a parenting deficiency.

Moreover, the evidence demonstrates that this parenting deficiency will not be remedied in H.S.W.'s undisputed "near future" of "a matter of weeks to maybe two months." In addressing whether K.W. could remedy his parental deficiencies within H.S.W.'s timeline, the trial court found:

> The father's substance use disorder evaluation from Navos, which was arranged by father's counsel, established that substance use disorder treatment alone--even if the father immediately engaged and was 100% compliant--would not be completed for at least 3-6 months, possibly longer. This is already longer than [H.S.W.]'s near future. This does not account for any of father's other services, which this court finds are necessary.

Indeed, the evaluation sought by his own counsel diagnosed K.W. with a moderate substance use disorder requiring a minimum of three months of treatment. This treatment recommendation exceeds even the two month maximum given for H.S.W.'s "near future," and therefore provides clear, cogent, and convincing evidence to support the trial court's finding that K.W.'s parental deficiency will not be remedied within the near future.

Additionally, K.W. informed the trial court that he would continue "self-medicating" with cannabis and alcohol. He had not engaged in treatment nor did he consider himself in need of treatment. K.W.'s refusal to participate further

18

prevents him from beginning what would be a minimum of three months of treatment. Thus, the State proved RCW 13.34.180(e), that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," by clear, cogent, and convincing evidence.

Finally, as to the nonstatutory requirement of parental unfitness, the evidence demonstrates that, as a result of his substance use, K.W. is "incapable of providing 'basic nurture, health, or safety.'" B.P., 186 Wn.2d at 313 (internal quotation marks omitted) (quoting A.B., 181 Wn. App. at 61). Both the CASA and Zablan testified as to their concerns that because of his substance use K.W. would struggle to meet the constant daily needs of a toddler. Additionally, Zablan described K.W.'s substance abuse as a "safety threat," in that he "is not able to manage his . . . behaviors." Zablan further explained

> that behavior negatively impacts child safety, specifically related to [K.W.]'s inability to maintain sobriety. This has been observed through positive UAs of THC and [alcohol]; being arrested for DUI; and doing his evaluations; and then also testing positive during those two. [H.S.W.] is three years old, vulnerable, and needs to make sure that her needs are being met consistently and with [K.W.] not being able to maintain [sobriety] that poses a safety threat as to [H.S.W.].

Thus, the testimony provides clear, cogent, and convincing evidence that because of his unacknowledged and untreated substance use disorder K.W. would be unable to consistently provide for the health and safety of a young child. Accordingly, he is currently unfit to parent H.S.W.

2

Similar to his arguments concerning the impacts of his substance use, K.W. contends that the record does not support a finding that domestic violence precludes his ability to parent H.S.W. He correctly asserts that the domestic violence evaluation did not assess his parenting or make recommendations about his care of children. Further, the parties agree that the record does not indicate any domestic violence directly targeting H.S.W. However, while the violence was not directed toward H.S.W., the trial court considered the history of domestic violence and K.W.'s failure to address it.

The trial court found: "The father has untreated domestic violence and is not engaged in treatment as recommended by his evaluation. The father is not engaged in domestic violence batterer's treatment and never engaged in treatment, which was estimated to take approximately one year." K.W. challenges this finding of fact, yet does not challenge general findings of fact that support this finding. Among the unchallenged findings that are now verities on appeal, the trial court found that K.W. was the respondent in a 2019 civil protection order with Ebonee Heller and "the factual basis of the petition includes allegations of physical assault and threats of harm."[1] Additionally, the court determined that K.W. was the protected party in a domestic violence no-contact order with H.S.W.'s mother but noted that "the mother reported to the Department that the domestic violence between the parents was mutual."

---

[1] In the briefing, K.W. argues that the evidence from Heller was hearsay and there was no substantive evidence of domestic violence. However, K.W. does not challenge the findings of fact as to the protection orders and the evidence supporting them

Finally, the court's finding that "[d]espite the existence of the order between the parents, and whether the father was the protected party or not, there was continued defiance of court orders with regard to the parents' contact with one another. This is concerning behavior," is also unchallenged.

These findings establish that K.W. has allegations of domestic violence and protection orders in two different relationships and displays "concerning behavior" with respect to continued defiance of the no-contact order that he sought to protect himself from H.S.W.'s mother. Additionally, the domestic violence assessment provider testified that previous reported incidents towards more than one partner is the risk factor that elevated his recommended treatment.[2] This evidence provides clear, cogent, and convincing evidence that K.W. has a history of untreated issues related to domestic violence.

Despite the evidence of a history of domestic violence, K.W. claims that his lack of compliance with domestic violence treatment is not a parental deficiency and the record does not support a finding that domestic violence causes him to be unfit to parent. However, the CASA explained the concern related to K.W.'s failure to engage in the recommended domestic violence treatment: "in these domestic violence interactions, at times he's been

---

[2] K.W. raises the issue of the unproved allegations that he had a prior kidnapping conviction and assigns error to the trial court's finding. "Although the Department made some mistakes on the case with respect to specific alleged criminal history of the father, those errors had no impact on the father's ability to participate in his court-ordered services or make progress in his case toward reunification." The domestic violence evaluator was specifically requested to ignore the alleged kidnapping conviction for K.W.'s assessment. When asked "when that information is eliminated from your consideration, does it change the recommendation or the recommended treatment for the father in this specific case?," the provider explained that the incidents of domestic violence with two partners raised the recommended treatment to level 3 without consideration of the kidnapping claims.

characterized as the perpetrator, at times as the victim. But in any case, he appears to place himself back into a situation where he is with--back into situations where domestic violence can occur." The CASA further testified as to how the untreated domestic issues amount to parental deficiency, citing research that proves "it is harmful for a child to live/reside in an environment where domestic violence is occurring between the adults in the environment." Indeed, our Supreme Court has agreed that a child is psychologically harmed or placed in fear by observing domestic violence, and therefore, held that exposure to domestic violence constitutes domestic violence. Rodriguez v. Zavala, 188 Wn.2d 586, 597-98, 398 P.3d 1071 (2017).

The evidence that K.W. placed himself in situations where domestic violence could reoccur, such as with H.S.W.'s mother thereby creating a risk of exposing H.S.W. to domestic violence, supports the finding of a parental deficiency. Additionally, the domestic violence evaluation recommended one year of treatment. Therefore, even if K.W. chose to engage in the recommended treatment, the deficiency would not be remedied within H.S.W.'s near future. Accordingly, the evidence supports that domestic violence is an ongoing safety risk such that K.W. is unfit to parent.

B

K.W. also contends that the Department failed to prove that termination of his parental rights was in H.S.W.'s best interests. This is so, he claims, because the undisputed evidence showed that "visits are going well" and H.S.W. is bonded with him. Br. of Appellant at 49. However, the evidence also established

that H.S.W. had been in dependency for the entirety of her life and needed a permanent and stable home sooner than K.W. could provide. Therefore, we disagree that the Department failed to meet its burden of proof that termination was in H.S.W.'s best interests.

Once the Department establishes the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the trial court must assess whether termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b); In re Dependency of T.R., 108 Wn. App. 149, 166-67, 29 P.3d 1275 (2001). The best interests determination requires a preponderance of the evidence which is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. In re Dependency of J.D.P., 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021). The criteria for establishing the best interests of the child are largely dependent on the facts and circumstances of the case. J.D.P., 17 Wn. App. 2d at 760. "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" T.R., 108 Wn. App. at 167 (alterations in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, when assessing H.S.W.'s best interests, the trial court focused on the length of time that she had been in dependency:

> The court finds by a preponderance of the evidence that
> termination of each of the parent's parental rights is in the child's
> best interest. [H.S.W.] has been out of home for over 38 months,

23

and she needs to have a permanent stable home sooner than either parent could give that to her. Over these many months, the parents were both given many opportunities to remedy their parental deficiencies. The parents have failed to make any progress in those months.

The trial court's finding of fact is supported by the testimony of two social workers and the CASA. When asked whether termination was in H.S.W.'s best interests, social worker Mudraya explained that

[H.S.W.] has been involved with us for her whole life. We are obligated to achieve permanency for [H.S.W.] in a timely manner, in a safe environment, where she can establish secure bonding -- secure bond with her care giver. And due to concerns that brought [H.S.W.] into care, not being remedied, that['s] why we're asking for the Court to grant the petition.

The CASA testified similarly:

[H.S.W.] deserves permanency. [H.S.W.]'s rights are supposed to be paramount. It would be unfair to continue the state of legal limbo that she is in, in dependency. We know that children in foster care are always at risk of losing their placement. And once a placement is lost, it can take two or three times for another placement to be found. I really fear that lack of stability for [H.S.W.].

Additionally, social worker Zablan testified that permanency was in H.S.W.'s best interests, especially in the context of the parent's inability to remedy their deficiencies and H.S.W.'s bond with her foster family. "[H.S.W.] deserves permanency and we provided parents with an ample amount of time to engage, to remedy parents with deficiencies and to feed that structure for [H.S.W.]. But it has not occurred yet at this time. And [H.S.W.] is safe and comfortable and attached to where she's at." Indeed, at the time of trial, H.S.W. was in an adoptive placement with a long-term caregiver.

24

In contrast, K.W. had only parented in three-hour increments and H.S.W. had never spent a night with him. Moreover, he would not, or could not, comply with the 30 days of clean urinalysis testing that the court required in order for him to begin overnight visits with H.S.W. Despite this, K.W. continued to express his belief that he did not have any parenting deficiencies. As the court found, K.W. "does not believe that he has any parental deficiencies that need to be addressed. There is no reason to believe that more time will result in the father doing any services." This finding of fact is unchallenged, and is therefore a verity on appeal.

Given the testimony as to H.S.W.'s need for permanence, the length of time that K.W. would need to complete the services necessary to remedy his parental deficiencies, and K.W.'s decision not to engage in the recommended treatment, a preponderance of the evidence supports the trial court's conclusion that termination of K.W.'s parental rights was in H.S.W.'s best interests. Accordingly, the trial court did not err in its entry of the order to terminate K.W.'s parental rights.

Affirmed.

Dwyer, J.

WE CONCUR:

_Chung, J._                _Brunner, J_